Opinion
SMITH, J.
Plaintiffs Stand Up for California! and Barbara Leach (plaintiffs) initiated this litigation by filing a complaint challenging the Governor’s authority to concur in the decision of the Secretary of the United States Department of the Interior to take land in Madera County into trust for defendant North Fork Ranchería of Mono Indians (North Fork) for the purpose of operating a casino for class III gaming. The Governor’s concurrence was a necessary element under federal law for the granting of permission to North Fork to operate the casino on the land. While the case was pending, the Legislature passed a statute ratifying a compact previously negotiated and executed with North Fork by the Governor. This compact is a device authorized by federal law to allow a state to agree with an Indian tribe on the terms and conditions under which gambling can take place on Indian land within the state. Plaintiffs then initiated Proposition 48, a referendum by which, at the 2014 general election, the voters disapproved the ratification statute. North Fork, having intervened, filed a cross-complaint alleging that the ratification statute was not subject to the referendum process.
North Fork and the state defendants—the Governor, the Attorney General, the California Gambling Control Commission, the Bureau of Gambling *691 Control, and the State of California—demurred to plaintiffs’ complaint challenging the Governor’s concurrence authority. Plaintiffs and the state defendants demurred to North Fork’s cross-complaint challenging the referendum.
The trial court sustained all the demurrers without leave to amend. The complaint and cross-complaint were dismissed. The result was that the land remained in trust for North Fork, but the compact was not ratified, so class III gaming on the land was not approved. Subsequently, however, as a product of federal litigation between North Fork and the state, a set of procedures designed to function as an alternative to a state-approved compact was approved by the Secretary of the Interior.
Appeals were filed from both judgments of dismissal, but the parties agreed to dismiss North Fork’s appeal in the case challenging the referendum, leaving only the concurrence issue. In my view, for reasons related to the lack of a state-approved compact or any future prospect of a state-approved compact for gambling on the land, any authority the Governor might have had to concur in a decision of the Secretary of the Interior to take the land into trust for purposes of gaming was inapplicable in this case, so the demurrers to plaintiffs’ claims on that issue should have been overruled.
FACTS AND PROCEDURAL HISTORY[1]
North Fork is a federally recognized Indian tribe with about 1,900 tribal citizens. It possesses a small rancheria in the Sierra Nevada foothills near the unincorporated community of North Fork. In March 2005, North Fork applied to the United States Department of the Interior (DOI) pursuant to the federal Indian Gaming Regulatory Act (18 U.S.C. §§ 1166-1167; 25 U.S.C. § 2701 et seq.) (IGRA) to have the federal government take into trust for North Fork’s benefit a 305-acre parcel in Madera County about 40 miles from the rancheria. The parcel, owned by North Fork’s development partner, is located on State Route 99 adjacent to the City of Madera. North Fork proposed building a hotel and casino on the site. Federal action taking the land into trust was a precondition to legal class III gaming under federal law. (25 U.S.C. § 2719(b)(1).) Class III gaming is the type of gambling practiced in casinos in the State of Nevada. (25 U.S.C. § 2703(6)—(8).)
In September 2011, DOI made a finding that, within the meaning of IGRA, taking the land into trust for the purpose of gaming would be in the best *692 interest of North Fork and would not be detrimental to the surrounding community. (25 U.S.C. § 2719(b)(1)(A).) The Governor, fulfilling a role delineated in IGRA, concurred in this determination in August 2012. (25 U.S.C. § 2719(b)(1)(A).) The Secretary of the Interior decided to take the land into trust in November 2012, and the conveyance was completed on February 5, 2013.
Concurrently with this process, the Governor pursued a tribal-state compact under Government Code section 12012.25 and article IV, section 19, subdivision (1), of the California Constitution. Under IGRA, a tribal-state compact is one of the methods of legalizing class III gaming on Indian land. (25 U.S.C. § 2710(d)(1)(C).) In August 2012, the Governor announced that he had negotiated and signed a compact with North Fork for gaming on the 305-acre parcel and was forwarding the compact to the Legislature for ratification.
Plaintiffs filed their complaint on March 27, 2013. As amended, the complaint named as defendants the State of California, the Governor, the Attorney General, the California Gambling Control Commission, and the Bureau of Gambling Control. It alleged that the Governor’s concurrence in the Secretary of the Interior’s determination violated the California Constitution because such a concurrence was not within the Governor’s power. The complaint prayed for a writ of mandate setting aside the concurrence.
A statute ratifying the compact, designated Assembly Bill No. 277 (2013-2014 Reg. Sess.), was passed by both houses of the Legislature. The Governor signed it on July 3, 2013, and it became chapter 51 of the Statutes of 2013. In addition to ratifying the compact, the statute exempted the casino project from compliance with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). (Stats. 2013, ch. 51, § 1(b).) The compact contained provisions, however, that required North Fork to produce a tribal environmental impact report similar to a CEQA environmental impact report. The compact was forwarded to the Secretary of the Interior, who published a notice in the Federal Register on October 22, 2013, stating that the compact was approved and was taking effect to the extent it was consistent with IGRA. (78 Fed.Reg. 62649 (Oct. 22, 2013).)
In the compact, the state authorized North Fork to conduct class III gaming on the 305-acre parcel, and North Fork agreed not to conduct gaming on its environmentally sensitive ranchería or elsewhere in California. North Fork agreed to make payments to the Chukchansi Tribe to mitigate the economic impact of the new casino on the existing Chukchansi casino. North Fork also agreed to share revenue with the Wiyot Tribe in order to enable that tribe to forgo gaming on its environmentally sensitive land near Humboldt Bay *693 National Wildlife Refuge. North Fork further agreed to participate in a revenue-sharing scheme to benefit other tribes without casinos. The compact included many additional terms, including North Fork’s submission to detailed regulations for the operation of its casino.
On July 8, 2013, Cheryl Schmit, using the letterhead of Stand Up for California!, asked the Attorney General for a title and summary for a proposed statewide referendum rejecting the compact ratification statute, chapter 51 of the Statutes of 2013. The Attorney General issued the title and summary, and signatures were gathered. The referendum qualified for the November 2014 general election ballot.
North Fork, which was not originally a party to the litigation initiated by plaintiffs’ complaint, was granted leave to intervene on August 23, 2013. North Fork filed its cross-complaint on February 27, 2014, naming the state defendants as cross-defendants. Schmit, the official proponent of the referendum petition, was named as a real party in interest. The cross-complaint sought a declaratory judgment stating that the referendum petition was invalid.
North Fork and the state defendants demurred to plaintiffs’ complaint (alleging that the Governor’s concurrence was unauthorized), and the trial court ruled on the demurrers on March 3, 2014. In its written ruling, the court stated that the Governor’s power to concur arose by implication from his authority to negotiate and execute tribal-state compacts, as set forth in article IV, section 19, subdivision (f), of the California Constitution. Because the Governor was authorized to negotiate compacts for gaming on Indian land, and some such compacts, including the one at issue in this case, cannot come into effect unless the land in question is taken into trust by the federal government with the Governor’s concurrence, the Governor must have the power to concur. The court rejected plaintiffs’ argument that when the voters added article IV, section 19, subdivision (1), to the California Constitution via Proposition 1A in 2000, they intended to deny to the state the authority to approve Indian casinos on land that was not yet Indian land at the time, so that there could be no casinos on newly added trust land. Plaintiffs conceded they could not cure their complaint by amendment, so the demurrers were sustained without leave to amend. A defense judgment was entered on March 12, 2014.
Plaintiffs, Schmit, and the state defendants demurred to North Fork’s cross-complaint (challenging the validity of the referendum), and the trial court ruled on the demurrers on June 26, 2014. The court wrote that the plain language of article II, section 9, subdivision (a), of the California Constitution was controlling. That provision states that the referendum power allows the *694 voters to reject “statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State.” (Cal. Const., art. II, § 9, subd. (a).) It was undisputed that chapter 51 of the Statutes of 2013 was a statute and not within one of those three exceptions. The court rejected North Fork’s argument that the ratification of the compact was in substance administrative, not legislative, so it was not subject to referendum despite its statutory form. The court also rejected North Fork’s argument that, in order to avoid a conflict between state law and IGRA, state law must be interpreted to deny the voters power to invalidate a tribal-state compact. North Fork declared it would not attempt to cure its cross-complaint by amendment, so the demurrers were sustained without leave to amend. Judgment dismissing the cross-complaint was entered on July 9, 2014.
The referendum was designated Proposition 48. A majority of voters voted “no” on Proposition 48 on November 4, 2014, thereby rejecting the Legislature’s ratification of the compact. (Historical and Statutory Notes, 32E pt. 1 West’s Ann. Gov. Code (2016 supp.) foil. § 12012.59, p. 13.)
Plaintiffs appealed from the dismissal of their complaint. North Fork appealed from the dismissal of its cross-complaint. On May 25, 2016, however, the parties filed a stipulation to dismiss North Fork’s appeal, thus removing the referendum issue from the case. Only the question of the Governor’s concurrence power remains.
On August 3, 2016, plaintiffs filed an unopposed request for judicial notice of action by DOI to approve a document called Secretarial Procedures for the North Fork Ranchería of Mono Indians (the secretarial procedures). According to a letter from DOI included in the request for judicial notice, the secretarial procedures were issued as a remedy for North Fork in litigation in federal court. In this litigation, as a consequence of the voters’ rejection of the compact via Proposition 48, the court found the state failed to negotiate with North Fork in good faith. This led to court-ordered mediation, which, producing no settlement, led in turn to the district court’s approval a set of procedures proposed by North Fork to regulate gambling on the 305-acre site in the absence of a state-approved compact. These procedures were submitted to DOI and, upon approval by the Secretary of the Interior, became the secretarial procedures. The letter, dated July 29, 2016, states that the secretarial procedures are in effect. This request for judicial notice is granted.[2]

*695
DISCUSSION

I. Standard of review
The standard of review is well established: “In an appeal from a judgment dismissing an action after a general demurrer is sustained without leave to amend, our Supreme Court has imposed the following standard of review. ‘The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed “if any one of the several grounds of demurrer is well taken. [Citations.]” [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment.’ ” (Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist. (2003) 113 Cal.App.4th 597, 603 [6 Cal.Rptr.3d 574].)
II. Legal framework for Indian gaming
IGRA was enacted in 1988. (Pub.L. No. 100-497 (Oct. 17, 1988) 102 Stat. 2467.) Its primary purpose is “to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.” (25 U.S.C. § 2702(1).)
Under IGRA, gambling is divided into three classes. Class I is “social games solely for prizes of minimal value or traditional forms of Indian gaming” connected with “tribal ceremonies or celebrations.” (25 U.S.C. § 2703(6).) On Indian lands, class I gaming is not subject to IGRA and is within the exclusive jurisdiction of Indian tribes. (25 U.S.C. § 2710(a)(1).) Class II is bingo, games similar to bingo, and certain card games. (25 U.S.C. § 2703(7).) IGRA places class II gaming on Indian lands under tribal jurisdiction in any state in which class II gaming is ever permitted by state law, subject to regulations in IGRA itself. (25 U.S.C. § 2710(b).)
Class III is all other gaming. (25 U.S.C. § 2703(8).) It includes “ ‘high-stakes casino-style’ gaming” and encompasses slot machines, casino games, banking card games, dog racing and lotteries, among other things. (Keweenaw Bay Indian Community v. U.S. (6th Cir. 1998) 136 F.3d 469, 473.) IGRA *696 permits class III gaming on Indian lands in any state in which class III gaming is ever permitted by state law, provided that the state and tribe enter into a tribal-state compact setting forth terms under which the gaming is to be conducted. (25 U.S.C. § 2710(d).)
Upon request by a tribe, a state is required to negotiate in good faith to enter into a tribal-state compact.[3] (25 U.S.C. § 2710(d)(3)(A).) After a state and a tribe enter into a compact, the compact is submitted to the Secretary of the Interior for review. The Secretary of the Interior has 45 days to approve or disapprove the compact; if he or she does not act within 45 days, the compact is deemed approved. The Secretary of the Interior is authorized to disapprove a compact only if it fails to conform to federal law. (25 U.S.C. § 2710(d)(3)(B), (d)(8).)
IGRA provides that, in general, gaming is not authorized on land acquired by the DOI in trust for an Indian tribe after the effective date of the statute, October 17, 1988. (25 U.S.C. § 2719(a).) One exception is when “the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary’s determination . . . .” (25 U.S.C. § 2719(b)(1)(A).) This is the provision, involving what is often referred to as the two-part determination, under which the Governor concurred in the conversion of the 305-acre parcel to trust status in this case.
When IGRA was enacted, the California Constitution prohibited all casino-type gambling statewide. (Cal. Const., art. IV, § 19, subd. (e); California Commerce Casino, Inc. v. Schwarzenegger (2007) 146 Cal.App.4th 1406, 1411 [53 Cal.Rptr.3d 626].) An initiative statute passed in 1998, Proposition 5, purported to authorize the state to enter into tribal-state compacts as contemplated by IGRA, but because the measure was only statutory, it was held to be invalid in fight of the constitutional gambling prohibition. (Hotel Employees & Restaurant Employees Internat. Union v. Davis (1999) 21 Cal.4th 585, 589-590 [88 Cal.Rptr.2d 56, 981 P.2d 990] (Hotel Employees).) In 2000, the voters approved Proposition 1A, which amended the California Constitution to authorize the state to enter into tribal-state compacts. (Cal. Const., art. IV, § 19, subd. (f); Historical Notes, *697 IE West’s Ann. Cal. Const. (2012 ed.) foil. art. IV, § 19, p. 604.) The Legislature enacted Government Code section 12012.25, authorizing the Governor to negotiate and execute tribal-state compacts and requiring the Governor to submit executed compacts to the Legislature for ratification. (Gov. Code, § 12012.25, subds. (d)-(e).)[4]
III. Governor’s concurrence power
Plaintiffs maintain that no authority can be found in state law empowering the Governor to concur in a finding by the Secretary of the Interior that taking land into trust for an Indian tribe for gaming purposes is in the best interest of the tribe and not detrimental to the surrounding community, within the meaning of IGRA. North Lork and the state defendants argued in the trial court, and argue again now, that the Governor should be found to have this authority according to three different analyses: (1) the Governor’s authority to concur arises by implication from his express authority to negotiate and execute compacts; (2) the Governor has authority to concur as part of his inherent authority as head of the executive branch of government; and (3) the Legislature impliedly ratified the concurrence when it ratified the compact, effectively supplying the Governor with authority after the fact. The trial court agreed with the first argument and did not address the others.
The parties agree that no statutory, constitutional, or other authority under state law explicitly authorizes the Governor to exercise the concurrence power contemplated by IGRA. Lurther, as plaintiffs point out, it has been held that any authority with which the Governor acts in granting his concurrence under IGRA must be based on state law; IGRA itself does not supply that authority: “When the Governor exercises authority under IGRA, the Governor is exercising state authority. If the Governor concurs, or refuses to concur, it is as a State executive, under the authority of state law. The concurrence (or lack thereof) is given effect under federal law, but the authority to act is provided by state law. ... In the present case, the consequences of the Governor’s exercise of discretion under state law will affect how the Secretary of the Interior will proceed to execute IGRA. No doubt, federal law provides the Governor with an opportunity to participate in the determination of whether gaming will be allowed on newly acquired trust land. But when the Governor responds to the Secretary’s request for a concurrence, the Governor acts under state law, as a state executive, pursuant to state interests.” (Confederated Tribes of Siletz Indians of Oregon v. U.S. (9th Cir. 1997) 110 F.3d 688, 697-698 (Confederated Tribes).)
*698 The Ninth Circuit made this point to show that, when a governor concurs or refuses to concur, he or she does not exercise significant authority under federal law, and does not possess primary responsibility for protecting a federal interest, and therefore IGRA’s employment of a state official to carry out a part of the statutory scheme does not violate the appointments clause of the federal Constitution. (Confederated Tribes, supra, 110 F.3d at pp. 696-698.) Under this reasoning, it follows that if no state law authorized the Governor to concur, then he lacked authority to do it.
In my view, the argument adopted by the trial court is indeed the most plausible of the arguments made by plaintiffs: The needed authority, if it exists, is found by implication in state law authorizing the Governor to negotiate and execute tribal-state compacts. Article IV, section 19, subdivision (1), of the California Constitution, which was added by Proposition 1A in 2000, states: ‘“[T]he Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law.” The Legislature provided substantially the same authority in Government Code section 12012.25, subdivision (d): ‘“The Governor is the designated state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes located within the State of California pursuant to the federal Indian Gaming Regulatory Act of 1988 (18 U.S.C. Sec. 1166 to 1168, inch, and 25 U.S.C. Sec. 2701 et seq.) for the purpose of authorizing class III gaming, as defined in that act, on Indian lands within this state.” In the opinion of the tribe, the state defendants and the trial court, this constitutional provision and this statute are rightly construed as empowering the Governor to concur in the Secretary of the Interior’s determination under title 25 United States Code section 2719(b)(1)(A) because of the unrestricted reference in both to ‘“Indian lands.” As I will explain, however, I need neither endorse nor reject that reasoning in this case. Even if it is correct, the Governor’s implied concurrence power would not extend to lands as to which there is no state-approved compact, nor any prospect of one, since the point of the implied concurrence power would be to give effect to the state’s compacting power.
In interpreting a statute, our objective is ‘“to ascertain and effectuate legislative intent.” (People v. Woodhead (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) To the extent the language in the statute may be unclear, we look to legislative history and the statutory scheme of which the statute is a part. (People v. Bartlett (1990) 226 Cal.App.3d 244, 250 [276 Cal.Rptr. 460].) We look to the entire statutory scheme in interpreting particular provisions ‘“so that the whole may be harmonized and retain effectiveness.” (Clean Air Constituency v. California State Air Resources Bd. *699 (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].) “In the end, we ‘ “must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.” [Citation.]’ ” (Torres v. Parkhouse Tire Service, Inc. (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].) The same principles apply to the interpretation of a voter initiative. Analyses and arguments contained in the official ballot pamphlet are relevant when the language of the enactment is unclear. (Robert L. v. Superior Court (2003) 30 Cal.4th 894, 900-901 [135 Cal.Rptr.2d 30, 69 P.3d 951].)
As the tribe and the state defendants point out, the term “ ‘Indian lands’ ” includes both land on Indian reservations and land taken into trust by the federal government for the benefit of Indian tribes. (25 U.S.C. § 2703(4).) Trust lands include those taken into trust for gaming purposes after 1988 under title 25 United States Code section 2719(b)(1)(A), the provision requiring the Secretary of the Interior’s findings and the Governor’s concurrence. Thus, the argument goes, the Governor cannot meaningfully negotiate and execute tribal-state compacts for some Indian lands—those taken into trust after 1988 under title 25 United States Code section 2719(b)(1)(A)— unless he can also exercise the concurrence power contemplated by that provision. It is well established that governmental officials in California have implied power to take action necessary for the administration of powers expressly granted by law. (Dickey v. Raisin Proration Zone No. 1 (1944) 24 Cal.2d 796, 810 [151 P.2d 505]; Crawford v. Imperial Irrigation Dist. (1927) 200 Cal. 318, 334 [253 P. 726]; Watt v. Smith (1891) 89 Cal. 602, 604 [26 P. 1071].) It follows, the tribe and the state defendants aver, that the Governor must have the power to concur in a determination to take land into trust for gaming when the state’s power to make a compact for gaming on that land is exercised.
The trouble with this argument in this case is that we now know the state’s power to make a compact is not being exercised for gaming on the 305-acre parcel. The voters decided to reject the compact that was negotiated and ratified; the tribe has dismissed its appeal in the litigation that was designed to revive that compact; and no new compact has been proposed by any party. Instead, the casino project is poised to proceed, but for the issue in this appeal, based on the secretarial procedures, which have been imposed against the state’s will.
I do not believe an implied concurrence power can be held to exist under these circumstances. Laws are deemed to have implied provisions and confer implied powers only when necessary for the carrying out of express provisions and powers. An implied power should have no greater scope than *700 this necessity requires. “ ‘ ‘“[F]or a consequence to be implied from a statute there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied. ‘A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.’ ” ’ ” (Lubner v. City of Los Angeles (1996) 45 Cal.App.4th 525, 529 [53 Cal.Rptr.2d 24].) It may be appropriate (there is no need to decide) to say that the Governor’s concurrence power is necessary under this standard to carry out the provisions of Proposition 1A because those provisions contemplate the possibility of state-approved tribal-state compacts for class III gaming on any Indian lands as defined by law, and some such compacts (those for post-1988 trust lands) cannot be made effective without a gubernatorial concurrence in a DOI finding regarding the land in question. But it would make no sense to say the gubernatorial concurrence power arises by necessary implication from the compacting power in Proposition 1A because secretarial procedures that have been issued cannot meaningfully become effective unless the Governor’s concurrence makes the land available. The concept of necessity limits the scope of any implied concurrence power to situations in which gambling on the land in question will be conducted pursuant to a state-approved compact, and the concurrence power is necessary to make such a compact effective. The concurrence power is not necessary to the carrying out of the compacting power in cases in which the compacting power is not being exercised.
In summary, it would be perverse to find the Governor has an implied authority based on an express power that the state has finally decided not to exercise, after protracted consideration by the Governor, the Legislature, and the voters. It is no denigration of the Governor’s authority to say he cannot exercise an implied power in a case where the voters have vetoed an exercise of the express power on which the implied power is purportedly based.
The effect of this conclusion is that the Governor’s concurrence for the 305-acre parcel is invalid without a state-approved compact for gaming on that parcel. Would that concurrence become valid if a new state-approved compact should come into being? It is not necessary to answer that question in this opinion.
IV. Inherent authority and implied ratification
North Fork and the state defendants argue that, even if there is no implied gubernatorial concurrence authority in the Proposition 1A compacting power, the Governor had inherent authority to give his concurrence, and the Legislature provided any missing authority by impliedly ratifying the concurrence when it ratified the compact. I turn to these arguments now.
*701 A. Inherent executive authority
The notion that the Governor has inherent power to grant his concurrence is approached from several angles in the briefs for North Fork and the state defendants. The state defendants and North Fork both undertake to rebut the idea that there would be a separation-of-powers violation if the Governor had the concurrence power because, in exercising the concurrence power, the Governor infringes on or usurps a legislative function. The Governor’s action is invalid because there is a lack of authority for it in the first place, not because the action infringes on the Legislature’s domain, so there is no need to address this contention.[5] North Fork also argues, however, that the concurrence power is ‘“[i]nherently [executive” and that the power “is a natural consequence of [the Governor’s] role as the head of the administrative state.” North Fork cites article V of the California Constitution, which states that “[t]he supreme executive power of this State is vested in the Governor,” and “[t]he Governor shall see that the law is faithfully executed.” (Cal. Const., art. V, § 1.) I understand these contentions to mean that the Governor is entitled to exercise the concurrence power contemplated by IGRA simply because he is the Governor; no specific express or implied grant of power is necessary under this view.
Among the cases cited by North Fork in connection with this argument, two seem most relevant: U.S. v. 1,216.83 Acres of Land (1978) 89 Wn.2d 550 [574 P.2d 375] (1,216.83 Acres) and Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. U.S. (7th Cir. 2004) 367 F.3d 650 (Lac Courte Oreilles). But neither of these shows that the Governor has inherent executive authority, independent of any specific express or implied grant of power, to issue concurrences as contemplated by IGRA.
In 1,216.83 Acres, the question was whether the governor of the State of Washington had authority to designate the state’s game commission as the agency responsible for approving federal land acquisitions for purposes of establishing migratory bird refuges pursuant to a federal statute, the Migratory Bird Conservation Act (16 U.S.C. § 715 et seq.). (1,216.83 Acres, supra, 574 P.2d at pp. 376-377.) The federal law provided that such acquisitions had to be approved by the governor or appropriate state agency in each state. (Id. at p. 376.) The Washington Supreme Court held that the game commission had the necessary authority to grant the approvals because a state statute expressly conferred on the commission authority to enter into agreements with the United States on all matters regarding wildlife conservation. (Ibid.) Then the court held that, although there was no state statute or state *702 constitutional provision specifically authorizing the governor to designate the commission, there was implied authority in “the Governor’s position as head of the executive branch of government.” (Id. at p. 379.) Further, the Governor’s authority to designate the agency was apparent “[i]n view of the extensive authority the Governor has already been given by statute over the game department and its personnel . . . .” (Ibid.)
The situation in 1,216.83 Acres is not similar to the situation here. The Migratory Bird Conservation Act called for certain action by an appropriate state agency, and a Washington statute named the agency responsible for such action. In designating that agency, the Governor of Washington merely pointed out what the state statute had already made clear. It was obvious that the governor had inherent authority to follow a state statute and direct a state agency to follow it. The Supreme Court of Washington rightly devoted only a single paragraph of analysis to this easy question. In our case, there is no state statute or other state law explicitly giving anyone responsibility for participating in the two-part determination necessary to take land into trust for gambling under IGRA. Further, even if I thought Proposition 1A impliedly gave the Governor the necessary authority in general, I would conclude that the authority is limited to land on which gambling will be conducted under a state-approved compact.
In Lac Courte Oreilles, the Governor of Wisconsin refused to concur in the Secretary of the Interior’s two-part determination for land on which three tribes proposed to operate a casino. (Lac Courte Oreilles, supra, 367 F.3d at p. 653.) The tribes sued for a declaration that the concurrence requirement in IGRA was unconstitutional. (Lac Courte Oreilles, supra, at p. 652.) One argument the tribes made was that the concurrence provision violated principles of federalism because it required governors to create state public policy, a function state constitutions commit to state legislatures. (Id. at p. 664.) Rejecting this contention, the Seventh Circuit reasoned that Wisconsin already had a policy on gambling expressed in its laws authorizing a state lottery and allowing bingo and raffles by certain nonprofit organizations. (Ibid.) Applying California v. Cabazon Band of Mission Indians (1987) 480 U.S. 202 [94 L.Ed.2d 244, 107 S.Ct. 1083] (Cabazon), the Seventh Circuit then concluded that, because the state did not prohibit all gambling, its policy was to tolerate gaming on Indian lands (since Cabazon held that a state cannot prohibit gaming on Indian lands if it chooses to permit any gambling elsewhere). The governor, in deciding whether to grant or withhold a requested concurrence, thus made no new policy but was guided by the old policy and acted in a manner “typical of the executive’s responsibility to render decisions based on existing policy.” (Lac Courte Oreilles, supra, at p. 664.)
*703 North Fork argues that, from the rationale of Lac Courte Oreilles, it follows that the Governor is merely acting within existing California gambling policy when he concurs in a two-part determination by the Secretary of the Interior, and therefore he needs no specific authority to do it.
I do not believe Lac Courte Oreilles supports this conclusion. The question in that case was whether the concurrence provision violated federalism principles because it involved the federal government compelling a governor to create state public policy, an act reserved by the state constitution to the state legislature. The answer given by the Seventh Circuit was that there was no such violation of federalism principles because, under the reasoning of Cabazon, the state already had a policy regarding Indian casinos, so the governor did not create a new policy by concurring or declining to concur. Under Cabazon and Lac Courte Oreilles, California would also properly be said to have a policy regarding Indian casinos and the Governor’s exercise of the concurrence power would not create that policy. This does not show, however, that the power to concur is inherent in the Governor’s office. There is no rule that the Governor has inherent authority to take any action he or she pleases in areas in which the state has an existing public policy.
In sum, Lac Courte Oreilles held only that the concurrence provision does not violate the federal Constitution because it does not force governors to usurp state legislative authority by making state public policy. It did not consider the question of whether any governor has inherent executive authority to exercise the concurrence power under any state’s law. “Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.” (Ginns v. Savage (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)
North Fork next says there are many federal statutes that call on the Governor to take actions without specific authority under state law, and “chaos would ensue” if such specific authority were held to be required. For instance, one section of a federal law on the establishment of airports in national parks provides that the Secretary of the Interior can acquire the necessary land, but only with “the consent of the Governor of the State, and the consent of chief executive official of the State political subdivision, in which the land is located.” (54 U.S.C. § 101501(c)(2).) Similarly, under the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. § 7901 et seq.), the Secretary of Energy is allowed to acquire land for radioactive materials disposal but in certain states must obtain “the consent of the Governor of such State” (42 U.S.C. § 7916). North Fork claims there is no specific authority in California law that would allow the Governor to give consent under these statutes.
*704 My analysis implies nothing regarding the Governor’s authority to act in connection with these other federal laws. I do not go beyond the proposition that there is no concurrence power when, on the land at issue, the proposed gambling establishment would be operated under authority other than a state-approved compact. In other words, if the concurrence power exists, it is limited by the purposes of the state law in connection with which it would be exercised, that is, the purposes of Proposition 1A. Those purposes involve the legalization of gambling in casinos regulated by state-approved compacts, not those regulated by secretarial procedures imposed over the state’s resistance. I think this limit would exist even if the Governor’s power were supported by inherent executive authority. If a statute limits the power of the Governor, the Governor would not be entitled to exceed that limit based on the theory that the power is part of his inherent authority. So it would be, at least, if the statutory limit did not amount to an unconstitutional legislative infringement on executive authority.
In short, I draw no conclusion about whether the Governor has inherent authority to grant concurrences under IGRA in general, let alone whether he or she has authority to give consent to federal actions under other federal laws. I aver only that any authority the Governor has to grant concurrences under IGRA is limited to land on which gambling will be subject to a state-approved compact.
Finally, North Fork claims the concurrence power is authorized by the Governor’s statutory role as the “sole official organ of communication” between California and the United States (Gov. Code, § 12012) and his or her statutory authority to “require executive officers and agencies and their employees to furnish information relating to their duties” (Cal. Const., art. V, § 4). This is not persuasive. The concurrence power involves more than communication or furnishing information.
B. Implied ratification
North Fork’s final argument is that when the Legislature ratified the compact, it impliedly also ratified the Governor’s concurrence, thereby supplying any authority that might have been lacking. This argument might have been persuasive had the compact been upheld in the 2014 election. As I have explained, however, any concurrence power the Governor possesses can operate only with respect to land on which gambling will be regulated by a state-approved compact. The voters have defeated the ratification of the compact, North Fork has withdrawn its legal challenge to the validity of the referendum, the state has declined to agree to a new compact via court-ordered mediation, secretarial procedures have been issued, and no party claims there is now any prospect of a state-approved compact for gambling *705 on the 305-acre parcel. Even if the Governor’s concurrence would have been valid otherwise, it is not valid under these circumstances.
V. Dismissal of state defendants other than the Governor
The state defendants argue that the claims against all of them except the Governor—that is, the Attorney General, the California Gambling Control Commission, the Bureau of Gambling Control, and the State of California— should be dismissed as moot because plaintiffs sought only a judgment prohibiting them from enforcing or implementing provisions of the compact. Section 8.2 of the secretarial procedures, however, gives the state the option of participating in the regulation of gambling on the 305-acre site under those procedures. In light of this, plaintiffs might still wish to pursue relief against all the state defendants and might be able to amend their complaint accordingly. Consequently, I conclude that plaintiffs’ claims against these defendants are not moot.

DISPOSITION

The judgment is reversed. The Governor’s concurrence is invalid under the facts alleged in this case. Plaintiffs have stated a cause of action for a writ of mandate to set the concurrence aside on the ground that it is unsupported by legal authority. The matter is remanded for further proceedings, and the trial court is directed to vacate its order sustaining the demurrers and enter a new order overruling them.
The request for judicial notice filed by plaintiffs on August 3, 2016, is granted.
The motion filed by plaintiffs on October 4, 2016, to strike portions of North Fork’s supplemental brief is denied.
Appellants are awarded costs on appeal.

 North Fork’s appeal. Stand Up for California! v. State of California (June 6, 2016, F070327), has been dismissed, but I take judicial notice of the record in that case for purposes of this statement of the facts and procedural history.

 On August 25, 2016, this court directed the parties to submit supplemental briefing. All parties filed supplemental briefs. On October 4, 2016, plaintiffs filed a motion to strike portions of North Fork’s supplemental brief on the ground that it cited various court opinions and other materials in which certain facts were recited. Plaintiffs contended the facts in question were not *695 subject to judicial notice. No facts influencing the result in this appeal have been introduced into the record through materials cited in North Fork’s supplemental brief. Plaintiffs’ motion to strike therefore is moot.

 IGRA provides that if a state fails to negotiate in good faith, a tribe has a cause of action, and the federal courts have jurisdiction over that action. A federal court then can order the state and tribe to engage in a mediation process, which, if unsuccessful, leads to the approval of gaming under terms imposed by the Secretary of the Interior. (25 U.S.C. § 2710(d)(7).) In Seminole Tribe of Fla. v. Florida (1996) 517 U.S. 44, 47 [134 L.Ed.2d 252, 116 S.Ct. 1114], however, the United States Supreme Court held that a state can obtain dismissal of such a lawsuit by invoking sovereign immunity under the Eleventh Amendment.

 In light of the holding in Hotel Employees, supra, 21 Cal.4th 585, it is really the constitutional provision, not the statute, that is doing the work of authorizing tribal-state compacts in California. For this reason, in the remainder of this opinion, I will refer to Proposition 1A as the law that gives the Governor the power to negotiate and execute compacts.

 For this reason, it is unnecessary to analyze United Auburn Indian Community of Auburn Rancheria v. Brown (2016) 4 Cal.App.5th 36 [208 Cal.Rptr.3d 487], which holds only that the Governor’s exercise of the concurrence power does not violate separation-of-powers principles.