# IN THE SUPREME COURT OF CALIFORNIA

UNITED AUBURN INDIAN COMMUNITY OF THE
AUBURN RANCHERIA,
Plaintiff and Appellant,
v.
GAVIN C. NEWSOM, as Governor, etc.,
Defendant and Respondent.

S238544

Third Appellate District
C075126

Sacramento County Superior Court
34-2013-80001412CUWMGDS

August 31, 2020

Justice Cuéllar authored the opinion of the Court, in which
Justices Chin, Corrigan, Kruger, and Fybel[*] concurred.

---

[*]     Associate Justice of the Court of Appeal, Fourth
Appellate District, Division Three, assigned by the Chief
Justice pursuant to article VI, section 6 of the California
Constitution.

Chief Justice Cantil-Sakauye filed a dissenting opinion, in which Justice Liu concurred.

UNITED AUBURN INDIAN COMMUNITY OF THE
AUBURN RANCHERIA v. NEWSOM

S238544

Opinion of the Court by Cuéllar, J.

This is a case about how California law applies to the delicate juncture of executive power, federalism, and tribal sovereignty. Under the federal Indian Gaming Regulatory Act (IGRA; 25 U.S.C. § 2701 et seq.), the United States Secretary of the Interior (Interior Secretary) may permit casino-style gaming on certain land taken into federal trust for an Indian tribe, so long as the Governor of the state where the land is located concurs. But nowhere in the California Constitution is the Governor granted explicit authority to concur in this cooperative-federalism scheme. We must decide whether the Governor nonetheless has the authority to concur in the Interior Secretary's determination to allow gaming on tribal trust land in California.[1]

What we hold is that California law empowers the Governor to concur. As amended in 2000, the California Constitution permits casino-style gaming under certain conditions on "Indian" and "tribal" lands — terms that

---

[1] The action was brought against Governor Edmund G. Brown, Jr., who concurred in the Interior Secretary's determination. Because Governor Gavin C. Newsom has since assumed office, we have substituted him as the defendant and respondent. (Code of Civ. Proc., § 368.5.)

encompass land where the Governor's concurrence is required before casino-style gaming may occur. Our decision is supported by the Governor's historical practice of concurring under a variety of federal statutes, the legislatively enacted expectation that the Governor represent the state's interests in negotiations or proceedings involving the federal government, and the absence of any explicit constitutional or statutory limits on the Governor's power to concur in the Interior Secretary's determination under IGRA.

These markers of the legal terrain help us map a zone of twilight between the powers of the Governor and the Legislature. But they also convey why legislative changes can, by bringing any implicit gubernatorial power to "its lowest ebb" in this domain, restrict or eliminate the Governor's concurrence power. (*Youngstown Co. v. Sawyer* (1952) 343 U.S. 579, 637 (conc. opn. of Jackson, J.) (*Youngstown*).) Because the Legislature has imposed no such restriction, however, we conclude the Governor acted lawfully when he concurred in the Interior Secretary's determination. The Court of Appeal reached the same conclusion, so we affirm.

## I.

The California Constitution specifically mentions casino-style gaming, "federally recognized Indian tribes," and lands that are "Indian" and "tribal" "in accordance with federal law." (Cal. Const., art. IV, § 19, subd. (f).) As these provisions — like IGRA — were enacted against the backdrop of longstanding tribal efforts to establish casino-style gaming operations on land under their control, we begin with a survey of the relevant history.

## A.

Long before this country's founding, Indian tribes already existed as "self-governing sovereign political communities," each with their own distinct lands. (*United States v. Wheeler* (1978) 435 U.S. 313, 322–323.) Tribes haven't "possessed [] the full attributes of sovereignty" since the federal Constitution was signed, but they remain a "separate people, with the power of regulating their internal and social relations." (*United States v. Kagama* (1886) 118 U.S. 375, 381–382.) Yet that power is bounded, too: Under the Indian commerce clause of the United States Constitution, Congress possesses the "plenary power to legislate in the field of Indian affairs" and to limit the powers that tribes otherwise possess. (*Cotton Petroleum Corp. v. New Mexico* (1989) 490 U.S. 163, 192.) So the sovereignty of Indian tribes "is of a unique and limited character[:] It exists [] at the sufferance of Congress and is subject to complete defeasance" if and when Congress acts. (*Wheeler, supra,* 435 U.S. at p. 323.)

These implicit contradictions have catalyzed conflicting expectations and struggles for power, with tribal gaming as a recurring flashpoint. Gaming is a significant enterprise for Indian tribes — it "cannot be understood as . . . wholly separate from the Tribes' core governmental functions." (*Michigan v. Bay Mills Indian Community* (2014) 572 U.S. 782, 810 (conc. opn. of Sotomayor, J.).) Gambling operations serve as a means for tribes "to assert their sovereign status and achieve economic independence." (Mason, Indian Gaming: Tribal Sovereignty and American Politics (2000) p. 4.) It is partly symbolic: "Gaming [] represents a stand for political independence as tribes assert their sovereign right to

determine for themselves what they can control on tribal lands." (*Ibid.*) But gaming also serves a practical function: Because of the limits placed on tribal governments' ability to impose taxes, gaming "may be the only means by which a tribe can raise revenues." (Struve, *Tribal Immunity and Tribal Courts* (2004) 36 Ariz.St. L.J. 137, 169.) In that sense, gaming operations are often essential to tribes' economic self-sufficiency.

Yet from the start, federal and state governments sought to curtail gaming on Indian land. (See Indian Gaming Regulatory Act, Hearing before House Com. on Interior and Insular Affairs on H.R. No. 964 and H.R. No. 2507, 100th Cong., 1st Sess., at p. 158 (1987), written testimony of Sen. Reid [unless Indian gaming is regulated, "the hope for controlling organized crime in this country will be lost forever"].) To prevent the perverse consequences some legislators believed would arise from such activities, Congress enacted legislation such as the Johnson Act of 1951 (15 U.S.C. § 1175(a)), which outlawed the manufacture, possession, or use of gambling devices, and the Organized Crime Control Act of 1970 (18 U.S.C. § 1955), which made it a federal offense to engage in any for-profit gambling business that was prohibited under state law.

Because of Congress's plenary power over Indian affairs, states initially lacked the authority to regulate tribal gaming. But in 1953, Congress enacted Public Law 280, which empowered six states — including California — to exercise criminal jurisdiction over Indian land. (18 U.S.C. § 1162; 25 U.S.C. §§ 1321–1326; 28 U.S.C. § 1360.) When California sought to enforce its state gambling law — which permitted,

subject to criminal penalties, gaming only when operated by certain charitable organizations with restrictions on prizes — against two Indian tribes, the tribes challenged the state's power to do so. The Supreme Court soon offered a partial answer to the question: To what extent did states have jurisdiction to enforce their own laws against tribes? Ruling in the tribes' favor, the Court distinguished between laws that were "prohibitory" and those that were "regulatory": Although Congress had allowed states to enforce prohibitions on gambling against Indian tribes, it hadn't bestowed states with "civil regulatory power over Indian reservations." (*California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202, 210, 208.) Because California's gambling law was regulatory in nature — "California regulates rather than prohibits gambling in general and bingo in particular" — the Court concluded that the state lacked the power to restrict tribal gaming. (*Id.* at p. 211.) Following *Cabazon*, states couldn't restrict or otherwise regulate Indian gaming operations unless they prohibited *all* gaming.

## B.

Congress responded to *Cabazon*'s new strictures on state regulation of Indian gaming by enacting IGRA. (25 U.S.C. § 2701 et seq.) Following centuries of conflict over gaming between tribes, states, and the federal government, Congress's purpose was to "balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land." (Sen.Rep. No. 100-446, 2d Sess., p. 5 (1988), reprinted in 1988 U.S. Code Cong. & Admin. News, p. 3075.) To that end, IGRA divided

gaming into three categories: class I, class II, and class III. Class I gaming, those played for "prizes of minimal value," would be regulated exclusively by Indian tribes. (25 U.S.C. § 2703(6).) Class II gaming, which includes higher-stakes games such as bingo, was also under the control of Indian tribes, unless a state prohibited such gaming for any purpose. (25 U.S.C. §§ 2703(7)(A)(i), 2710.)

This dispute concerns class III gaming. All forms of gaming that aren't covered by class I or class II gaming come within the ambit of class III — including casino-style games such as slot machines, roulette, and blackjack. (25 U.S.C. § 2703(8).) Because class III gaming can be "a source of substantial revenue for the Indian tribes and a significant rival for traditional private sector gaming facilities," its regulation "has been the most controversial part of [] IGRA and the subject of considerable litigation between various Indian tribes and the states." (*Flynt v. California Gambling Control Commission* (2002) 104 Cal.App.4th 1125, 1134.) Before a tribe can conduct class III gaming, it must satisfy several requirements under IGRA — such as forming a tribal-state compact, in which the tribe and the state agree on issues surrounding tribal gaming operations.[2]

---

[2] Class III gaming must also satisfy other requirements under IGRA: It must be authorized by an ordinance or resolution adopted by the governing body of the Indian tribe and the Chairman of the National Indian Gaming Commission and located in a state that permits such gaming for any purpose by any person, organization, or entity. These requirements are not at issue in this case.

IGRA also imposes additional requirements for Indian tribes wishing to conduct class III gaming on certain types of land. The federal government has, throughout our nation's history, adopted policies that have removed Indian tribes from their native reservations and radically reduced their land bases. In an effort to rectify these past wrongs and to reconstitute these land bases, Congress enacted the Indian Reorganization Act of 1934 (IRA). (25 U.S.C. § 5101 et seq.; see Cohen's Handbook of Federal Indian Law (2019 ed.) § 4.04(3)(a).) The IRA allows the Interior Secretary to acquire and take land into trust for an Indian tribe. (25 U.S.C. § 5108.) Class III gaming on land taken into trust after October 17, 1988 — the date Congress enacted IGRA — may occur only under certain conditions set forth in the federal statute. The condition at issue here requires that the Interior Secretary, "after consultation with the Indian tribe and appropriate State and local officials, . . . determine[] that a gaming establishment on [those] acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community." (25 U.S.C. § 2719(b)(1)(A).) "[T]he Governor of the State in which the gaming" will occur must also "concur[] in the [Interior] Secretary's determination." (*Ibid.*)

## C.

In 2002, the Enterprise Rancheria of Maidu Indians (the Enterprise Tribe) made a request culminating in the gubernatorial concurrence at the heart of this case. The tribe sought for the Interior Secretary to acquire land in Yuba County in trust on the tribe's behalf so the Enterprise Tribe could build a casino featuring class III gaming. Before taking

the land into trust, the Interior Secretary determined that the proposed venue was in the best interest of the tribe and wasn't detrimental to the surrounding community. In accordance with IGRA's requirements, the Interior Secretary notified the Governor in 2011 and sought his concurrence in the determination.

Nearly a decade after the Enterprise Tribe's initial request, in 2012, the Governor concurred. He explained that conducting class III gaming on that land would "directly benefit" a "large tribal population" of "more than 800 native Californians who face serious economic hardship." (Governor Edmund G. Brown, Jr., letter to Interior Secretary Kenneth L. Salazar, Aug. 30, 2012.) The casino would "create jobs and generate revenue for Yuba County," which had "a 16% unemployment rate" at the time. (*Ibid*.) On the same day he sent his concurrence letter, the Governor executed a tribal-state gaming compact between the state and the Enterprise Tribe. A few months later, the Interior Secretary took the land into trust for the Enterprise Tribe.

United Auburn Indian Community owns and operates the Thunder Valley Casino Resort, located about 20 miles from the proposed site of the Enterprise Tribe's casino.[3] Believing

---

[3] The Enterprise Tribe's casino resort, the Hard Rock Hotel & Casino Sacramento at Fire Mountain, has since opened. (See McGough, *Ready to 'Rock': Hard Rock Hotel & Casino Sacramento unveils opening date*, Sac. Bee (Sept. 6, 2019) <https://www.sacbee.com/article234801132.html> [as of Aug. 28, 2020]; all Internet citations in this opinion are

that the Governor's concurrence was unlawful under state law, United Auburn filed a petition for a writ of mandate and complaint for injunctive relief. The Governor demurred to the complaint, arguing that the California Constitution and state statutes empowered him to concur in the Interior Secretary's determination, and that his concurrence didn't violate the separation of powers. The superior court sustained the demurrer and entered judgment in the Governor's favor.

The Court of Appeal affirmed. It rejected each of United Auburn's contentions: that the Governor lacked the power to concur under California law, that the Governor's concurrence was a legislative act that violated the separation of powers, and that the Governor exceeded his authority by entering into compact negotiations for land that hadn't yet been taken into trust by the Interior Secretary. (*United Auburn Indian Community of the Auburn Rancheria v. Brown* (2016) 4 Cal.App.5th 36, 54.) Shortly after that decision, a different appellate court held that the Governor lacked the authority to concur in the Interior Secretary's determination. (*Stand Up for California! v. State of California* (2016) 6 Cal.App.5th 686, 705.) We granted review to resolve the split.

## II.

Under IGRA, the Interior Secretary may allow class III gaming on land the federal government takes into trust for an Indian tribe after IGRA was enacted if she determines that gaming would be in the best interest of the tribe and would not

archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.)

be detrimental to the surrounding community. But it is only with the concurrence of the Governor from the state where gaming would occur that IGRA allows the Interior Secretary's decision to take effect. (25 U.S.C. § 2719(b)(1)(A).) What IGRA does not resolve is whether the Governor has a legal basis to concur; gubernatorial power arises from state constitutional and statutory authority. Although the Governor's "concurrence (or lack thereof) is given effect under federal law, [] the authority to act is provided by state law." (*Confederated Tribes of Siletz Indians of Oregon v. U.S.* (9th Cir. 1997) 110 F.3d 688, 697.) So we must determine whether California law empowers the Governor to concur.[4]

### A.

The power of the Governor is rooted in our state Constitution and further structured by statutes that must themselves conform to constitutional constraints. (See generally Cal. Const., art. V; *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1041.) A brief history of gambling in California helps inform the scope of the Governor's power in the sphere of tribal gaming.

---

[4] That IGRA requires the Governor's concurrence before class III gaming can occur on certain trust lands arguably demonstrates a legislatively enacted expectation that state governors generally possess the concurrence power. It's unlikely that lawmakers would require governors to exercise a concurrence power they believed they lacked. Regardless of what federal lawmakers believed, however, it is in California law that the Governor must find authority.

The California Constitution, as enacted in 1849, prohibited lotteries and the sale of lottery tickets. (Cal. Const. of 1849, art. IV, § 27.) And when the Penal Code was enacted in 1872, it prohibited several activities that fall within the ambit of gambling, including slot machines, roulette, and — whatever it means — hokey-pokey.[5] (Pen. Code, §§ 330, 330a.) Over time, however, our supreme charter has been amended several times to loosen those prohibitions. In 1933, for example, an amendment to the Constitution authorized the Legislature to allow horse races and horse race wagering. (Cal. Const., art. IV, § 19, subd. (b).) In 1976, the Constitution was amended again to authorize the Legislature to permit bingo gaming for charitable purposes. (Cal. Const., art. IV, § 19, subd. (c).) And a 1984 constitutional amendment "authorized the establishment of a California State Lottery." (Cal. Const., art. IV, § 19, subd. (d).) These exceptions did not, however, encompass the casino-style gaming at issue in this case. Indeed, "[i]n 1984, the people of California amended our Constitution to state a fundamental public policy against the

---

[5] Just about the only thing that's clear about the term "hokey-pokey" is that it wasn't a reference to the traditional children's dance song. Former Attorney General of California Frederick Howser acknowledged that hokey-pokey "cannot be defined by consulting any standard reference work," and even "[e]xhaustive research" had failed to yield any mention of the illicit game. (*"Stud-Horse Poker" and "Hokey-Pokey" Are Illegal Card Games*, Healdsburg Tribune (Mar. 28, 1947) p. 7.) It appears to have been a variation on poker. (See Singsen, *Where Will the Buck Stop on California Penal Code Section 330: Solving the Stud-Horse Poker Conundrum* (1988) 11 Hastings Comm./Ent. L.J. 95, 138–139.)

legalization in California of casino gambling." (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 589; see Cal. Const., art. IV, § 19, subd. (e).) What the Constitution was amended to convey is that "[t]he Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e).)

That prohibition lasted until 2000. That year, California voters enacted Proposition 1A, which amended the Constitution to give the Governor authority "to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and [other class III gaming] by federally recognized Indian tribes on Indian lands in California in accordance with federal law." (Cal. Const., art. IV, § 19, subd. (f).) Notwithstanding the Constitution's general restriction on casino-style gaming, Proposition 1A allowed that type of gaming "to be conducted and operated on tribal lands subject to [tribal-state] compacts." (Cal. Const., art. IV, § 19, subd. (f).)

The parties agree that Proposition 1A provides the starting point for our analysis. They also agree that Proposition 1A doesn't expressly grant the Governor the power to concur — it only authorizes him "to negotiate and conclude compacts . . . for the operation of slot machines and [other class III gaming]." (Cal. Const., art. IV, § 19, subd. (f).) Where they differ in their views is whether the ballot initiative's language, context, and history, taken together, prohibit the Governor from concurring, and whether the Governor's concurrence violates the separation of powers.

**B.**

The Governor's initial argument is a sweeping one: He contends that, although Proposition 1A doesn't expressly grant the Governor the power to concur, it nevertheless "presupposes that the Governor possesses [that] power." Because Proposition 1A allows casino-style gaming "in accordance with federal law," and because federal law — IGRA — is designed on the premise that state governors may concur in the Interior Secretary's determination to allow gaming on that land, the Governor argues that the California Constitution implicitly bestows on him the power to offer the requisite concurrence under IGRA. Under the Governor's proposed interpretation of Proposition 1A, the California Constitution allows gaming to the full extent that federal law permits it — and no other provision of state law restricts such gaming. But this precise argument, we conclude, lacks support in the language of Proposition 1A. Gubernatorial powers aren't limited to explicitly enumerated grants of authority. But given the preexisting, constitutionally enshrined policy against casino-style gaming in California, the Governor fails to demonstrate that the most reasonable reading of Proposition 1A's phrase "in accordance with federal law" is one automatically allowing him to exercise any conceivable power that IGRA contemplates governors may exercise over gaming. Nor does anything in IGRA's text, structure, or history suggest Congress sought to use federal authority — assuming it was enough to preempt state law in this manner — to unilaterally grant governors the power to concur. So Proposition 1A's mere reference to federal law does not, by itself, bestow the Governor with the concurrence power.

That Proposition 1A, by itself, falls short of granting the Governor the power to concur does not resolve the question before us. Even in the absence of an express grant of authority, each branch of government possesses certain inherent and implied powers. (See *Spear v. Reeves* (1906) 148 Cal. 501, 504.) We've often discussed such powers in the context of the judiciary — courts possess an inherent power "to admit and to discipline attorneys" (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 592) and " 'to punish [parties] for contempt' " (*Burns v. Superior Court of City and County of San Francisco* (1903) 140 Cal. 1, 4). The Legislature can wield certain implied and inherent powers as well, such as the power to investigate (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 499) and the "power to create any agency it wishes unless the power is denied it by the Constitution" (*County of Sonoma v. State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 375, fn. 4 (dis. opn. of Mosk, J.)). Some of the powers that inhere to the executive arise by implication, too. It's "well settled," for example, that an executive officer "may exercise . . . powers as are necessary for the due and efficient administration of powers expressly granted by statute" or "may fairly be implied from the statute granting the powers." (*Dickey v. Raisin Proration Zone* (1944) 24 Cal.2d 796, 810, italics omitted.) The Governor's implied powers include the authority to add a reasonable condition to a prisoner's pardon or commutation. (*Ex parte Kelly* (1908) 155 Cal. 39, 41.)

United Auburn contends that even if inherent and implied powers are within the ambit of the Governor's authority, the power to concur in the Interior Secretary's

determination isn't among them. Its argument is rooted in article IV, section 19, subdivision (e) of the California Constitution — which, as United Auburn characterizes it, "states a broad and far-reaching prohibition on [casino-style] gaming." According to United Auburn, the Governor may not concur in the Interior Secretary's determination to allow class III gaming on Indian land taken into trust because California law prohibits class III gaming.

That argument, however, overlooks the pivotal role Proposition 1A plays in the story of how California has regulated gaming. That ballot initiative amended the California Constitution to allow casino-style gaming "by federally recognized Indian tribes *on Indian lands*" and "on *tribal lands*" in California, "in accordance with federal law." (Cal. Const., art. IV, § 19, subd. (f), italics added.) United Auburn first urges us to construe this language as referring only to land for which the Governor's concurrence isn't required to conduct class III gaming. So according to United Auburn, the voters enacting Proposition 1A would have understood they were allowing for casino-style gaming on Indian reservations, as well as on land taken into trust before IGRA was enacted and certain land taken into trust after IGRA was enacted — on which casino-style gaming may take place without the Governor's concurrence — but *not* on land taken into trust after IGRA's effective date if the Governor's concurrence is required for class III gaming on such land.

That assertion clashes with the meaning of Indian land under federal law. IGRA defines "Indian lands" to include "any lands title to which is [] held in trust by the United States for the benefit of any Indian tribe or individual." (25 U.S.C.

15

§ 2703(4)(B).) When the federal government takes land into trust for an Indian tribe, therefore, that land necessarily becomes Indian land. This definition of Indian land — which encompasses reservation land and tribal trust land, regardless of whether the Governor's concurrence is required for gaming on the land — is supported by federal Indian law more generally. (See *Oklahoma Tax Comm'n v. Potawatomi Tribe* (1991) 498 U.S. 505, 511 ["[No] precedent of this Court has ever drawn the distinction between tribal trust land and reservations"]; Cohen's Handbook of Federal Indian Law (2019 ed.) § 3.04(2)(c)(ii) ["The Supreme Court has [] held that tribal trust land is the equivalent of a reservation and thus Indian country"]; Rest., Law of American Indians (Tent. Draft No. 2, Mar. 13, 2018) § 15, subd. (a) [defining "Indian lands" to include "lands held by the United States in trust for an Indian tribe or individual members of an Indian tribe"].) When construing initiatives such as Proposition 1A, we presume electors "to [have been] aware of existing laws and judicial construction[s] thereof" when they voted. (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11.) Nowhere did Proposition 1A offer its own definition of "Indian lands" or "tribal lands." And Proposition 1A's Voter Information Guide explained to voters that federal law regulated gaming on Indian land (Voter Information Guide, Primary Elec. (Mar. 7, 2000) analysis of Prop. 1A by Legis. Analyst, p. 4) — indeed, the text of the ballot proposition said it was allowing class III gaming "on Indian lands in California in accordance with federal law" (*id.*, text of Prop. 1A, p. 90). None of this bolsters the case for assuming that the terms "Indian lands" and "tribal lands" in

16

Proposition 1A have a narrow, bespoke content different from their ordinary meaning under federal law.

United Auburn then seeks to buttress its argument by offering a somewhat different definition of "tribal lands" and "Indian lands": land recognized as Indian land when IGRA was enacted, but not after. This proposed interpretation of the terms pivots not on whether casino-style gaming would require the Governor's concurrence, but instead on whether the Indian land was acquired *after* IGRA was enacted — irrespective of whether that land has become "Indian" or "tribal" land "under federal law" in the decades since IGRA's effective date.

That definition is also implausible. The language of Proposition 1A offers no indication that voters enshrined in the Constitution the technical, inside-baseball distinction between gaming on federally designated Indian land *before* IGRA's effective date (what United Auburn proposes to be true "Indian" or "tribal" lands), and after. IGRA, for its part, allows class III gaming on certain land taken into trust for an Indian tribe after the statute's effective date without the Governor's concurrence, so long as the Governor executes a tribal-state compact. (See 25 U.S.C. § 2719(b)(1)(B)(i)–(iii) [casino-style gaming on "lands [] taken into trust as part of[:] [¶] (i) a settlement of a land claim"; "(ii) the initial reservation of an Indian tribe acknowledged by the [Interior] Secretary under the Federal acknowledgment process"; or "(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition" does not require the Governor's assent].) Under United Auburn's argument, however, Proposition 1A prohibits class III gaming from taking place even on these lands.

We are not persuaded. United Auburn's contention lacks support in the language of Proposition 1A, which explicitly empowers the Governor to negotiate and conclude compacts for class III gaming on "Indian lands . . . in accordance with federal law" and "permit[s]" class III gaming "on tribal lands subject to those compacts." (Cal. Const., art. IV, § 19, subd. (f).) Because Proposition 1A allows class III gaming on "Indian lands in California in accordance with federal law," it makes little sense to interpret article IV, section 19 as prohibiting such gaming on certain trust lands — considered Indian lands under federal law — for which IGRA does not even require the Governor's concurrence before class III gaming may occur. (*Ibid.*) United Auburn's interpretation would also cut against the cooperative-federalism scheme created by IGRA to permit class III gaming on Indian land. We decline to create such a conflict between state and federal law where none exists.[6] (See *California ARCO Distributors, Inc. v. Atlantic Richfield Co.* (1984) 158 Cal.App.3d 349, 359 ["State and federal laws should be accommodated and harmonized where possible"]; *Huron Cement Co. v. Detroit* (1960) 362 U.S. 440, 446 ["[The Supreme] Court's decisions [] enjoin seeking out conflicts between state and federal regulation where none clearly exists"].)

What we find more persuasive is the most reasonable inference from Proposition 1A's text and context: The terms

---

[6] United Auburn itself appears to abandon this proposed reading of "Indian lands" and "tribal lands" in its reply brief, reverting to its previous argument that "the voters [who enacted Proposition 1A] meant to facilitate gaming that required no concurrence."

"Indian" and "tribal" lands — which appear in close proximity to the phrase "in accordance with federal law" — are best understood, as they are under federal law, to include Indian reservation land and all land the federal government has acquired in trust for the benefit of Indian tribes. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 1A, p. 90.) In the absence of any specialized definition of the terms within Proposition 1A, the most reasonable understanding of voters' purpose in enacting Proposition 1A is that they sought to permit casino-style gaming on all Indian land in accordance with federal law — notwithstanding the California Constitution's general restriction on casino-style gaming. (Compare Cal. Const., art. IV, § 19, subd. (e) with Cal. Const., art. IV, § 19, subd. (f).)

That Indian land encompasses reservation land as well as land taken into trust for Indian tribes bears on another of United Auburn's arguments. It points our attention to the fact that Proposition 1A empowers the Governor only "to negotiate and conclude compacts" for gaming on Indian land — not to concur in the Interior Secretary's determination. (Cal. Const., art. IV, § 19, subd. (f).) Because compacting and concurring are distinct actions, United Auburn contends, the Governor's authority to compact doesn't imply his power to concur.

We agree that the power to negotiate compacts with Indian tribes does not, by itself, imply the power to concur. But neither does Proposition 1A's failure to expressly mention the power to concur imply any sort of limitation on the Governor's inherent powers — including his power to concur. The ballot initiative amended the Constitution to bestow the Governor with the power "to negotiate and conclude compacts .

19

. . for the operation of [casino-style gaming] . . . on Indian lands in California." (Cal. Const., art. IV, § 19, subd. (f).) Because casino-style gaming cannot occur on some Indian lands — certain land taken into trust for an Indian tribe after IGRA was enacted — without the Governor's concurrence, the power to negotiate compacts for class III gaming on those lands is consistent with the Governor exercising his inherent power to concur to allow class III gaming to occur on those lands.

Suppose voters had limited the Governor's compacting power to land on which casino-style gaming could occur without his concurrence. One might then reasonably expect that the Proposition would have limited the Governor's power to negotiate compacts only where the land in question was "reservation land," land designated as "Indian land" before IGRA was enacted, or "Indian land not requiring a concurrence." Yet nothing close to this limitation appears in the language of Proposition 1A. (Cf. *City of Port Hueneme v. City of Oxnard* (1959) 52 Cal.2d 385, 395 [a statute's omission of a term used elsewhere " 'is significant to show' " a different intended purpose].) What Proposition 1A's language conveys instead is that the Governor's power to negotiate and conclude compacts for class III gaming extends to all land that counts as "Indian" or "tribal" under federal law, with no intricate pre- or post-IGRA, concurrence or no concurrence proviso. That the Governor has the power to negotiate and conclude compacts for class III gaming on "Indian" and "tribal" land thus demonstrates that article IV, section 19, subdivision (e)'s general ban on casino-style gaming doesn't apply to gaming on land taken into trust after IGRA was enacted for which the

Governor's concurrence is required. (See Cal. Const., art. IV, § 19, subd. (e).)

Unable to ground its argument in the four corners of the ballot proposition, United Auburn seeks firmer footing in Proposition 1A's ballot materials. It explains that Proposition 1A's proponents advocated for passage of the ballot proposition "so we can keep the gaming we have on our reservations." (Voter Information Guide, Primary Elec. (Mar. 7, 2000) argument in favor of Prop. 1A, p. 6.) United Auburn also contends that the primary motivation for Proposition 1A appears to have been to ratify 57 compacts that California had negotiated before 2000 — compacts for land on which gaming could occur without the Governor's concurrence. (*Id.*, analysis of Prop. 1A by Legis. Analyst, pp. 4–5.) And it calls our attention to a back-and-forth exchange between supporters and opponents of the initiative included in the ballot materials, in which proponents of Proposition 1A wrote: " 'Proposition 1A and federal law strictly limit Indian gaming to tribal land. The [opponents'] claim that casinos could be built anywhere [if Proposition 1A is enacted] is totally false.' " (*Id.*, rebuttal to argument against Prop. 1A, p. 7.)

It's true that ballot materials sometimes illuminate how we interpret voter initiatives. (See *People v. Valencia* (2017) 3 Cal.5th 347, 364.) But these materials don't support the weight United Auburn hoists onto them, and they don't override our understanding of Proposition 1A's language: that class III gaming may occur on Indian land. (See *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934 (*California Cannabis Coalition*) ["we may consider extrinsic sources, such as an initiative's ballot materials" only if "the

21

provision['s] intended purpose [] remains opaque" after analysis of its text].)  The Governor's interpretation, too, fits with the maxim of Proposition 1A's proponents:  That the proposed ballot initiative " 'strictly limit[s] Indian gaming to tribal land,' " and that " 'the claim[s] that casinos could be built anywhere is totally false.' "  (Voter Information Guide, Primary Elec. (Mar. 7, 2000) rebuttal to argument against Prop. 1A, p. 7.)  Class III gaming, after all, may occur only on reservation land or land the federal government has converted to Indian land by taking it into trust for an Indian tribe.  We acknowledge that the language included in these materials arguably supports the conclusion that the predominant rationale behind Proposition 1A was to allow Indian tribes to conduct class III gaming on land for which the Governor's concurrence wasn't required — including on land for which California had negotiated 57 compacts before 2000.  What the materials do not suggest, however, is that the most defensible account of Proposition 1A's purpose was to allow casino-style gaming *only* on lands associated with those compacts.

In response to this line of argument, the dissent invokes a private website, www.yeson1A.net, that Proposition 1A's proponents cited in their rebuttal to arguments against the ballot proposition.  Because that website "equated 'Indian lands' and 'tribal lands' with 'reservation lands,' and indicated that tribal casinos would be limited to these lands," the dissent contends, voters would have construed Proposition 1A to authorize casinos only on Indian reservations.  (Dis. opn., *post*, at p. 22, fn. 4.)  Not even United Auburn advances such a narrow construction of Proposition 1A — as we've explained, both definitions of "Indian" and "tribal" lands offered by United

Auburn encompass some kinds of Indian trust land in addition to Indian reservations. Taking account of a private website that showed up as a link in one of the ballot statements — even if there's no particular evidence that many voters examined its contents — could conceivably make sense in light of how we consider appropriate extrinsic sources when the initiatives we interpret are unclear. (See *California Cannabis Coalition, supra*, 3 Cal.5th at p. 934.) What makes less sense is to give outsized importance to its peculiar interpretation when there's no particular logic or argument persuasively supporting its theory, and it goes beyond what the ballot materials themselves imply. In any event, we parse the website differently. The website's homepage explained that "Prop 1A . . . simply allows federally-recognized California tribes to continue to have gaming on federally-designated tribal land, as provided by federal law" — and the very next sentence identified IGRA as the relevant federal law. (Yes on 1A, *Proposition 1A . . . The California Indian Self-Reliance Amendment on the March 2000 State Ballot* (Mar. 6, 2000) <http://digital.library.ucla.edu/websites/2000_999_028/> [as of Aug. 28, 2020].) The dissent cites a different portion of the website, but the point it conveys is the same: It stated that "federal law strictly limits tribal gaming to Indian lands only" before explaining that Congress enacted "[t]he Indian Gaming Regulatory Act . . . in 1988." (Yes on 1A, Proposition 1A: Answers to Common Questions (Mar. 6, 2000) <http://digital.library.ucla.edu/websites/2000_999_028/> [as of Aug. 28, 2020].)

Elsewhere the dissent suggests that Proposition 1A may have used "Indian lands" as a term of art — one referring to

"reservation lands and after-acquired trust lands for which no concurrence is required." (Dis. opn., *post*, at p. 19.) Like United Auburn, however, the dissent fails to persuasively explain why the "Indian lands" term of art would happen to encompass only those trust lands on which gaming may occur without the Governor's concurrence, but not other trust lands which require the Governor's concurrence for class III gaming. That federal law draws a line to distinguish "Indian lands" from other lands is not in dispute. What that line fails to do is draw any distinction between lands where gaming may occur with or without a governor's concurrence. Instead, as we've explained, federal law defines all these lands as Indian land. (See Cohen's Handbook of Federal Indian Law (2019 ed.) § 3.04(2)(c)(ii).) So whereas the dissent questions the transparency of Proposition 1A's ballot materials (dis. opn., *post*, at p. 26), we read those materials to reiterate a consistent message as it's relevant to this case: Proposition 1A would allow class III gaming on all Indian land, as defined by IGRA.

Nor have we any reason to conclude that our interpretation would "put[] gambling casinos right in everyone's backyard," as opponents of Proposition 1A warned. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) argument against Prop. 1A, p. 7.) Amicus curiae North Fork Rancheria observes that the Interior Secretary has requested gubernatorial concurrences only 16 times nationwide in the 31 years since IGRA was enacted, and state governors have concurred in only 10 of those determinations. So in the subset of instances where the Interior Secretary agrees that land held in trust for a tribe may be used for gaming, the required

gubernatorial concurrence further narrows where gaming may occur.[7]

We find no reason to conclude from these ballot materials, from Proposition 1A's language, or from any other

---

[7] The dissent claims that our opinion allows "a single state official, the Governor," to exercise the "consequential power" of allowing class III gaming on land taken into trust after IGRA was enacted. (Dis. opn., *post*, at p. 17–18.) What this bold assertion seems to miss is that nothing in our opinion anoints the Governor Emperor of tribal gaming. The dissent's reading of our conclusion overlooks several pieces of an intricate jigsaw puzzle that must fall into place before class III gaming can occur on land taken into trust after IGRA's effective date: An Indian tribe must duly authorize casino-style gaming. (25 U.S.C. § 2710(d)(1)(A).) A state must permit that type of gaming for any purpose by any person, organization, or entity. (*Id.*, § 2710(d)(1)(B).) The gaming must abide by the terms of a tribal-state compact. (*Id.*, § 2710(d)(1)(C).) For land that doesn't satisfy other conditions in IGRA, the Interior Secretary must determine that gaming would be in the best interest of the tribe and wouldn't be detrimental to the surrounding community. (*Id.*, § 2719(b)(1)(A).) And the Legislature remains free to restrict the Governor's concurrence power if it so chooses. (See *ante*, pp. 35–37.) What our opinion does conclude is that the Governor may concur in the Interior Secretary's determination to allow class III gaming — if (and only if) all the other necessary conditions for class III gaming are satisfied in this cooperative-federalism scheme. Nowhere does the dissent persuasively justify its assumptions that article IV, section 19 of the California Constitution imposes a "flat prohibition of Nevada and New Jersey-style casinos" despite Proposition 1A's explicit amendment of the state Constitution in 2000 to permit some class III gaming, or that a gubernatorial concurrence under IGRA is prohibited unless it's expressly authorized. (Dis. opn., *post*, at pp. 25–26.)

provision of the California Constitution that the Governor is barred from concurring in the Interior Secretary's determination to allow class III gaming on land taken into trust for an Indian tribe after IGRA was enacted. What we find instead is that article IV, section 19, subdivision (f) — added to the California Constitution by Proposition 1A — allows class III gaming to occur "subject to [Governor-negotiated] compacts" on all "Indian" or "tribal" lands. Included among these lands are those that require the Governor to concur before class III gaming is permitted. To somehow find among these words a categorical rule against gubernatorial concurrences is to place on the constitutional provision's delicate frame a weight it cannot bear.

## C.

United Auburn also argues that separation of powers concerns cut against recognition of a concurrence power here. Even if the California Constitution — as amended by Proposition 1A — doesn't prohibit the Governor from concurring in the Interior Secretary's determination, United Auburn posits, the Governor lacks that power because concurring is a legislative function, not an executive one. To find otherwise, claims United Auburn, infringes on the Legislature's prerogatives. That the language enshrined in the Constitution by Proposition 1A appears in article IV of the Constitution — a section that contains other legislative powers — underscores for United Auburn that concurrence is a legislative function.

Although we endeavor to read constitutional provisions in context, the placement of a provision isn't dispositive to our analysis. Consider the constitutional provision authorizing

this court to recommend (or decline to recommend) that an application for executive pardon or clemency be granted to a defendant who has been "twice convicted of a felony." (Cal. Const., art. V, § 8, subd. (a).) That power — primarily judicial in nature — doesn't become an executive one simply because it appears in article V of the Constitution, which contains executive functions. So we decline to characterize the Governor's concurrence as a legislative act simply because Proposition 1A added a provision to article IV of the California Constitution.

Nor can we assume, as United Auburn's argument presumes, that we can in every instance neatly disaggregate executive, legislative, and judicial power. Treating these domains as entirely separate and independent spheres contrasts with the more nuanced treatment of these powers — and their frequent overlap — under our state constitutional system. (See *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52 ["California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' "].) Indeed, our Constitution's history "strongly supports a flexible, nonformalist understanding of separation of powers in which the functions of the offices are fluid." (Zasloff, *Taking Politics Seriously: A Theory of California's Separation of Powers* (2004) 51 UCLA L.Rev. 1079, 1106; cf. *Seila Law LLC v. Consumer Financial Protection Bureau* (2020) 140 S.Ct. 2183, 2226 (dis. opn. of Kagan, J.) ["[T]he separation of powers is, by design, neither rigid nor complete"].) Rather than attempt to characterize the Governor's concurrence power as a wholly legislative or

executive one, we construe the power as containing features that cut across both categories.

That fact isn't fatal to the Governor's exercise of the concurrence power, for nothing in our separation of powers jurisprudence demands " 'a hermetic sealing off of the three branches of Government from one another.' " (*Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 338.) We've instead recognized "that the three branches of government are interdependent," and so government officials frequently perform — and are permitted to perform — actions that "may 'significantly affect those of another branch.' " (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 298.) What the doctrine prohibits is "one branch of government [] exercising the *complete* power constitutionally vested in another" (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 117), or exercising power in a way " ' "that undermine[s] the authority and independence of one or another coordinate [b]ranch" ' " (*Carmel Valley*, *supra*, 25 Cal.4th at p. 297). So the question before us is whether concurring in the Interior Secretary's determination unduly limits the role and function of the legislative branch.

We begin our analysis, once again, with Proposition 1A. Although the constitutional amendment doesn't expressly authorize the Governor to concur, it does allow casino-style gaming to occur on Indian land in accordance with federal law. Proposition 1A was significant because it amended the Constitution to signal a policy of greater openness toward casino-style gaming — which California had previously prohibited. (See Cal. Const., art. IV, § 19, subd. (e).) When he concurs in the Interior Secretary's determination to allow class

III gaming on land taken into trust for an Indian tribe, therefore, the Governor acts consistently with the state's policy toward gaming on Indian land, as established by voters. He is not, as United Auburn would have us believe, engaging in "gubernatorial legislation."

That the Governor has historically been tasked with concurring — or declining to concur — under a variety of federal statutes also supports our conclusion that the concurrence power is an executive one. (See *In re Battelle* (1929) 207 Cal. 227, 242.) Since 1958, federal law has required gubernatorial consent before the secretary of a military department may order Army or Air National reservists to active duty. (10 U.S.C. § 12301(b).) The Migratory Bird Conservation Act, enacted in 1961, requires the Governor's approval before land can be acquired from the migratory bird conservation fund. (16 U.S.C. § 715k-5.) Since 1970, the Clean Air Act has required the consent of the Governor before the Administrator of the Environmental Protection Agency (EPA) may grant waivers to allow the construction of certain new source polluters. (42 U.S.C. § 7411(j)(1)(A).) The National Estuary Program, established in 1987, requires gubernatorial concurrence before the EPA Administrator may approve a conservation and management plan for an estuary. (33 U.S.C. § 1330(f)(1).) And the Temporary Assistance for Needy Families Program, enacted in 1996, prohibits parents from receiving benefits if they are not employed or participating in community service unless the "chief executive officer of the State opts out." (42 U.S.C. § 602(a)(l)(B)(iv).)

The concurrence power isn't a hollow one — the Governor has exercised it throughout our state's history. (E.g. *California*

*Society of Anesthesiologists v. Brown* (2012) 204 Cal.App.4th 390, 395 ["Governor Arnold Schwarzenegger . . . exercised his discretion under federal law [42 C.F.R. § 482.52(c)(1) (2020)] [to opt] California out of the federal physician supervision Medicare reimbursement requirement"]; Fort Ord Reuse Authority, Media Release: Major Event in Completion of Early Transfer of Former Fort Ord Property (Aug. 12, 2008) <https://dtsc.ca.gov/wp-content/uploads/sites/31/2019/04/ FORA_MediaRelease.pdf> [as of Aug. 28, 2020] [Governor Schwarzenegger's concurrence in the transfer of 3,337 acres of land for economic reuse "provide[d] approval to begin a $100 million privatized munitions and explosives cleanup program" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq.]; U.S. Gen. Accounting Off., Rep. to the Ranking Minority Member, Com. on Commerce, H.R., Hazardous Waste: Information on Potential Superfund Sites (Nov. 1998), at pp. 350–352 [Governor of California declined to approve placement of three sites on the National Priorities List for hazardous waste cleanup under CERCLA]; Governor Pete Wilson, letter to Administrator Carol Browner, Nov. 17, 1993 [concurring in the EPA Administrator's conservation and management plan for an estuary under the National Estuary Program]; Governor Edmund G. Brown, Jr., letter to Doctor Robert M. White[8] [approving a proposed management program

---

[8] Governor Brown's letter is available at: <https://books.google.com/books?id=By75Tpr47w4C&lpg=PA15 &dq=Combined%20CCMP%20%26%20Final%20EIS&pg=PA7# v=onepage&q&f=false> [as of Aug. 28, 2020].

under the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 et seq.].) And although the Legislature has expressly authorized the Governor to concur under some of these schemes (see, e.g., Fish & G. Code, § 10680), it has remained silent regarding the Governor's concurrence power under most of them. Historical practice thus demonstrates that the Governor has the authority to concur in cooperative-federalism schemes such as IGRA without express legislative authorization, so long as the Governor's concurrence is consistent with state law.

United Auburn seeks to distinguish the Governor's concurrence here by asserting that it "has massive land-use and tax-base consequences." The Governor's concurrence causes the land taken into trust for an Indian tribe to no longer "be subject to California's civil, criminal, and tax jurisdiction." According to United Auburn, the pivotal role a concurrence plays in the Interior Secretary's determination — and how that determination triggers these significant results — makes it unlawful for the Governor to exercise that power.

United Auburn's acute concern about the consequences of a gubernatorial decision is misplaced. United Auburn is correct that taking land into trust for an Indian tribe causes that land to no longer be subject to state or local taxes. (25 U.S.C. § 5108.) But because it is the Interior Secretary — not the Governor — who retains exclusive authority over whether to take land into trust (25 C.F.R. § 151.3 (2020)), it is not the Governor's concurrence that carries with it that effect. In any event, closer scrutiny demonstrates that the effect of the Governor's concurrence under IGRA isn't materially distinct from that under other cooperative-federalism schemes

requiring his concurrence.  Consider the federal law requiring the United States Secretary of Energy to consult with and obtain the consent of the Governor of a state where land will be acquired for the purpose of disposing radioactive waste.  (42 U.S.C. § 7916.)  Or the requirement that the Interior Secretary obtain a governor's concurrence before acquiring land in national parks for the establishment of an airport.  (54 U.S.C. § 101501(c)(2).)  These examples illustrate how gubernatorial decisions routinely trigger enormous consequences for local communities.  For these reasons, the consequences of the Governor's concurrence in the Interior Secretary's determination don't affect the scope of his power, so long as his concurrence is consistent with state law.

The concurrence power is also consistent with the Governor's historic role as the state's representative — a role he has held since before the California Constitution was enacted.  At the 1849 constitutional convention, delegates agreed that "it is a well[-]established principle" that the Governor ought to communicate directly with, and represent the state to, the federal executive branch.  (Browne, Report of the Debates in the Convention of California on the Formation of the State Constitution in September and October, 1849 (1850) p. 277.)  The Legislature later codified the Governor's station as "the sole official organ of communication between the government of this State and the government of . . . the United States" when it enacted Government Code section 12012.  This provision, which readily demonstrates a legislatively enacted expectation that the Governor serve as the state's representative to the federal government, bolsters the argument that the Governor is capable of playing a role in

federal schemes that depend on the state government to convey an official position on behalf of the state of California. (Cf. *Dames & Moore v. Regan* (1981) 453 U.S. 654, 677 ["statutes [are] highly relevant in the looser sense of indicating" the scope of executive power, even in the absence of express constitutional authority].)

Indeed, finding the Governor unable to concur in the Interior Secretary's determination under IGRA would be in tension with his legislatively enacted authority under Government Code section 12012. At oral argument, United Auburn conceded that the Governor's executive power encompasses consulting informally with federal officials who seek his perspective on decisions that may affect the state. United Auburn nevertheless seeks to distinguish that correspondence from IGRA's requirement that the Interior Secretary consult with and obtain the Governor's concurrence before class III gaming may occur on land taken into trust for an Indian tribe after IGRA's effective date. Yet the Governor's concurrence under IGRA is akin to analogous communications with the federal government in which he serves as the state's representative — particularly when the federal officer with whom he communicates makes the discretionary decision to assign significant weight to the Governor's views. That Congress required the Interior Secretary to garner the concurrence of state governors, rather than leaving that decision to the Interior Secretary's discretion, doesn't by itself strip the Governor of power to serve as "the sole official organ of communication" between the state and the federal government. (Gov. Code, § 12012.)

The resulting constitutional and statutory picture in this case reveals not only nuances about how California has chosen to conduct relations between the state and the federal government, but also the subtle shades depicting the precise limits of the respective powers of the Governor and the Legislature here. Recall that the California Constitution and other state law once prohibited casino-style gaming. (See Cal. Const., art. IV, § 19, subd. (e); Pen. Code, §§ 330, 330a.) But in 2000, voters amended the Constitution to allow that type of gambling under certain conditions. (Cal. Const., art. IV, § 19, subd. (f).) In so doing, they bestowed certain powers on the Governor — the power to "negotiate and conclude compacts" for class III gaming "on Indian lands in California in accordance with federal law" — and other powers on the Legislature — the authority to ratify (or decline to ratify) those compacts. (*Ibid.*)

What the newly amended Constitution didn't address, at least not expressly, was whether the Governor has the power to concur in the Interior Secretary's determination to allow class III gaming on certain land taken into trust for an Indian tribe after IGRA was enacted, or the division of authority between the executive and legislative branch over that task. Yet in the years since Proposition 1A was enacted, our Legislature has not — in contrast to the lawmaking bodies of other states (see, e.g., Ariz. Rev. Stat., § 5-601(a), (c) [authorizing the Arizona Governor to negotiate and execute compacts but expressly prohibiting the Governor from concurring in the Interior Secretary's determination]) —

exercised its authority to enact legislation limiting the Governor's power to concur.[9]

In the absence of an express grant or denial of authority, we conclude that the Governor's concurrence falls within a "zone of twilight in which he and [the Legislature] may have concurrent authority" and where legislative "inertia, indifference or quiescence" invites the exercise of executive power. (*Youngstown, supra,* 343 U.S. at p. 637 (conc. opn. of Jackson, J.).) By opening the door for class III gaming on "Indian" and "tribal" lands — some of which require a gubernatorial concurrence before class III gaming may occur — Proposition 1A put an end to California's "flat prohibition of Nevada and New Jersey-style casinos" (dis. opn., *post,* at p. 25), thereby opening the door for the Governor to concur in the

---

[9] Indeed, the Legislature has declined to restrict the Governor's power to concur under IGRA despite being given the opportunity to do so. Assembly Bill No. 1377 (2017-2018 Reg. Sess.), introduced in February 2017, would've required the Governor to seek the Legislature's approval before concurring in the Interior Secretary's determination to allow casino-style gaming on land taken into trust for an Indian tribe after IGRA was enacted. The bill failed to pass before the end of the 2017–2018 regular session and died on January 31, 2018 under article IV, section 10, subdivision (c) of the California Constitution. (Assem. Bill No. 1377 (2017–2018 Reg. Sess.).) Although "[w]e have often said that mere legislative inaction is a 'weak reed' upon which to rest any conclusion about the Legislature's intent" (*Prachasaisoradej v. Ralphs Grocery Co., Inc.* (2007) 42 Cal.4th 217, 243), the Assembly's consideration and rejection of Assembly Bill No. 1377 arguably demonstrates some measure of acquiesce by the Legislature in the Governor's concurrence power.

Interior Secretary's determination allowing gaming on those lands. (Cal. Const., art. IV, § 19, subd. (f).) The Governor's concurrence in that determination is consistent with his historic practice of concurring in a variety of cooperative-federalism schemes, and his role as the state's representative under Government Code section 12012. So we find it consistent with Proposition 1A and our separation of powers jurisprudence to conclude that, despite the absence of specific legislative authorization, California law empowers the Governor to concur.

That power, however, isn't an indefeasible one. Although our analysis of Proposition 1A and other state law supports the finding that the Governor has the power to concur, it also demonstrates that the legislative branch is capable of enacting legislation that would reduce the Governor's concurrence power to "its lowest ebb." (*Youngstown, supra,* 343 U.S. at p. 637 (conc. opn. of Jackson, J.).) The Legislature may, for example, require the Governor to obtain legislative authorization before concurring in the Interior Secretary's determination — just as Proposition 1A requires the Legislature to ratify compacts that the Governor negotiates and concludes before they become effective. (See Cal. Const., art. IV, § 19, subd. (f).) Because neither the California Constitution nor other state law speaks directly to the Governor's concurrence power under IGRA, California law is not inconsistent with this conclusion: That the Legislature may restrict or eliminate the Governor's implicit power to concur. In the absence of state law creating such a limitation, however, we may not enact one on the Legislature's behalf. We conclude that current California law permits the Governor's

concurrence in the Interior Secretary's determination to allow class III gaming on Indian land taken into trust for an Indian tribe after IGRA was enacted.[10]

### III.

United Auburn argues that even if the Governor generally has the power to concur, he lacks that power in this particular case. Its argument relies on the Governor's order of operations. According to United Auburn, the California Constitution limits any gubernatorial power to negotiate and conclude compacts for class III gaming, and to concur in the Interior Secretary's determination permitting gaming, to land designated as "Indian land" at the time of the compact negotiations. Because the land at issue in this case hadn't yet been taken into trust for the Enterprise Tribe when the Governor negotiated and concluded the compact to allow gaming, United Auburn contends that the Governor's compact and concurrence were invalid.

The language of our constitutional charter belies this argument. By amending the Constitution to add article IV,

---

[10] Because we conclude that the Legislature may restrict the Governor's power to concur, we reject the argument of amicus curiae Picayune Rancheria: that Congress has violated the anticommandeering doctrine by prohibiting other branches of government from constraining the Governor's power to concur. Our conclusion that California law, rather than federal law, empowers the Governor to concur also dispels United Auburn's suggestion that IGRA "almost certainly run[s] afoul of the [Tenth] Amendment of the U.S. Constitution" by bestowing the Governor with the concurrence power.

section 19, subdivision (f), Proposition 1A empowered the Governor to negotiate and conclude compacts "for the operation . . . and for the conduct of [class III gaming] by federally recognized Indian tribes on Indian lands in California." Those requirements were satisfied here — when the Enterprise Tribe engaged in class III gaming, it did so on land the federal government had, by that point, designated as Indian land by holding it in trust for the Enterprise Tribe.

Nothing in the Constitution restricts the Governor's power to negotiate and conclude compacts to parcels designated "Indian land" at the time the negotiation happens. That there's no such constraint makes sense in light of historical practice: The 57 compacts negotiated and executed by California, which Proposition 1A ratified, allowed class III gaming to occur on land that hadn't yet been taken into trust and didn't otherwise constitute Indian land at the time of negotiation. Indeed, the land ultimately taken into trust for United Auburn wasn't yet Indian land when California and the tribe negotiated and concluded the compact for class III gaming on the tribe's land. (See *City of Roseville v. Norton* (D.D.C. 2002) 219 F.Supp.2d 130, 135–136.) We decline to read into the Constitution a requirement that not only appears nowhere in its text but would also invalidate the gaming operations of Indian tribes across the state — including those of United Auburn.

## IV.

For decades, California imposed on itself a categorical prohibition on casino-style gaming that surely restricted not only legislative authority, but gubernatorial power. Yet as the wheel of time spun, voters placed their bets on a Constitution

that regulated — rather than prohibited — casino-style (class III) gaming and empowered the Governor to negotiate and conclude compacts for casino-style gaming on Indian land in California. In doing so, voters enacted Proposition 1A and changed the situation materially. They amended state law to allow class III gaming on all "Indian" and "tribal" lands "in accordance with federal law." (Cal. Const., art. IV, § 19, subd. (f).) The Governor's historical practice of concurring in a range of other cooperative-federalism schemes, and his longstanding and legislatively enacted role as the state's representative to the federal government, demonstrate that he may concur in the Interior Secretary's determination without violating the Legislature's prerogatives.

The Legislature nonetheless plays a robust role in responding to the use, and defining the scope, of executive power. Nearly seven decades have passed since Justice Jackson emphasized that constitutions of separated powers "enjoin[] upon its branches separateness but interdependence" — "autonomy but reciprocity." (*Youngstown*, *supra*, 343 U.S. at p. 635 (conc. opn. of Jackson, J.).) And while the materials before us are not quite as "enigmatic as the dreams Joseph was called upon to interpret for Pharaoh" (*id.* at p. 634), they nonetheless require nuanced interpretation for us to discern how California's Constitution allows executive and legislative prerogatives to coexist in the continuing story of its calibrated approach to tribal gaming. Although lawmakers haven't done so yet, they remain free to restrict or eliminate the Governor's authority to concur. That the Legislature has enacted no such law means the power to concur remains in the

Governor's hands.  As for the power that remains in our hands, we affirm the judgment of the Court of Appeal.


**CUÉLLAR, J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**
**FYBEL, J.**[*]

---

[*]     Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# UNITED AUBURN INDIAN COMMUNITY OF THE AUBURN RANCHERIA v. NEWSOM

## S238544

Dissenting Opinion by Chief Justice Cantil-Sakauye

I respectfully dissent. "In the case of a voters' initiative statute . . . we may not properly interpret the measure in a way that the electorate did not contemplate: the voters should get what they enacted, not more and not less." (*Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114.) This same principle applies when we interpret a legislative constitutional amendment approved by the voters.

The outcome here turns on the interpretation of Proposition 1A, a ballot measure through which the electorate amended the state Constitution in 2000 to carve out a limited exception to the prevailing state policy against "casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e).) The majority holds that as amended by Proposition 1A to allow for gaming compacts between the state and individual Indian tribes, the state Constitution allows the Governor to concur with a federal determination that it would be appropriate to situate a gambling facility on certain off-reservation lands that may be placed into trust for a tribe by the federal government. This concurrence represents the only authorization by a California state official that is absolutely required under federal law for sophisticated gaming, including slot machines and banked card games, to take place on these lands. Whether the Governor possesses the power to concur is therefore an issue of great

1

significance to the Indian tribes of this state that engage or want to engage in casino operations, not to mention anyone else interested in where gambling can occur within state boundaries.

I would hold that the Governor lacks such a power. The voters who approved Proposition 1A endorsed gaming compacts, and only compacts. The measure is not properly read as authorizing concurrences as well. An average voter would not have understood such a consequential power as implied or otherwise envisioned by Proposition 1A's authorization of gaming compacts, for reasons including the fact that the power to concur is not invariably or even normally necessary to effectuate the compacting power. That Proposition 1A did not entail a power to concur becomes even more apparent when its provisions are read in legal and historical context and in the light cast by the relevant ballot materials. These resources clarify why voters might have authorized tribal gaming at locations that do not require a concurrence but not at those sites where a concurrence is a prerequisite; and they confirm that Proposition 1A is best construed as striking such a balance.

For these reasons, as elaborated below, it is my view that the court's decision today recognizing a power to concur gives the voters who approved Proposition 1A quite a bit more — or depending on one's perspective, less — than they bargained for. I would reverse the judgment of the Court of Appeal and remand for further proceedings.

## I. BACKGROUND

My understanding of what the state Constitution, as amended by Proposition 1A, does and does not allow derives from a review of federal and state law applicable to tribal gaming and how this body of law developed over time. A summary of these principles and events follows.

Our state has long forbidden, limited, or regulated different forms of gambling. (See *Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 591–594 (*Hotel Employees*).) Well along in this history, in 1984 the electorate approved Proposition 37, which authorized a state lottery (Cal. Const., art. IV, § 19, subd. (d)) as an exception to the general prohibition on lotteries and lottery tickets that appears at article IV, section 19, subdivision (a) of the state Constitution. Proposition 37 also added subdivision (e) to article IV, section 19 of the state charter (article IV, section 19(e)). This provision announces, "The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey." This bar on casino gaming "was designed . . . to elevate statutory prohibitions on a set of gambling activities to a constitutional level." (*Hotel Employees*, at pp. 605–606.)

### A. The Indian Gaming Regulatory Act

Four years later, after the decision of the United States Supreme Court in *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 upended state constraints on tribal gaming, Congress enacted the Indian Gaming Regulatory Act, or IGRA. (Pub.L. No. 100-497 (Oct. 17, 1988) 102 Stat. 2467, as amended & codified at 25 U.S.C. § 2701 et seq., 18 U.S.C. § 1166 et seq.) This law provides a framework

through which Indian tribes can develop gaming operations in a manner that allows for the assertion of legitimate state interests that may be implicated by such activity. (See *Confederated Tribes of Siletz Indians v. U.S.* (9th Cir. 1997) 110 F.3d 688, 693 (*Confederated Tribes*).)

### 1. The compact requirement for class III gaming

IGRA recognizes three different tiers, or "classes" of gaming that may occur on Indian lands if the necessary prerequisites are satisfied. " ' "Class I" consists of social games for minimal prizes and traditional Indian games; "Class II" includes Bingo and similar games of chance such as pull tabs and lotto; "Class III" includes all games not included in Classes I or II.' " (*Rumsey Indian Rancheria of Wintun Ind. v. Wilson* (9th Cir. 1994) 64 F.3d 1250, 1255–1256 (*Rumsey Indian Rancheria*).)

Class I gaming on Indian lands is within the exclusive jurisdiction of tribes. (25 U.S.C. § 2710(a)(1).) Class II gaming on these lands is generally permitted if "located within a State that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law)," and "the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the" tribe's chairperson. (25 U.S.C. § 2710(b)(1)(A), (B).)

Class III gaming, which includes slot machines and banked card games, is by far the most lucrative of the three gaming categories and "is subject to a greater degree of federal-state regulation than either class I or class II gaming." (*In re Indian Gaming Related Cases* (9th Cir. 2003) 331 F.3d 1094,

1097.) Section 11 of IGRA provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are" duly authorized by a tribe, "located in a State that permits such gaming for any purpose by any person, organization, or entity," and "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." (25 U.S.C. § 2710(d)(1)(A), (B), (C).) "IGRA's compact requirement grants States the right to negotiate with tribes located within their borders regarding aspects of class III tribal gaming that might affect legitimate State interests." (*In re Indian Gaming Related Cases*, 331 F.3d at p. 1097.) Through this mechanism, "[t]he compacting process gives to states civil regulatory authority that they otherwise would lack under *Cabazon*, while granting to tribes the ability to offer legal class III gaming." (*Artichoke Joe's California Grand Casino v. Norton* (9th Cir. 2003) 353 F.3d 712, 716.)

A compact between a tribe and a state may contain the parties' agreement on matters such as the kinds of class III gaming that will occur, how this gaming will be regulated, and various other matters relevant to these operations. (25 U.S.C. § 2710(d)(3)(C).) Compacts also require federal approval to become effective. (*Id.*, § 2710(d)(3)(B).) A state that allows class III gaming must negotiate in good faith with a tribe that requests a gaming compact. (*Id.*, § 2710(d)(3)(A).)[1] If a tribe

---

[1] There is a split of authority regarding whether a state must engage in good faith negotiations concerning class III gaming if it allows *any* kind of class III game, or if a state must so negotiate only if it allows the specific class III game(s) that a tribe wants to pursue. (Compare *Rumsey Indian Rancheria*,

believes the state has failed to satisfy this responsibility, IGRA provides for a cause of action in federal court, enforceable against a state that has waived its immunity under the Eleventh Amendment to the United States Constitution. (25 U.S.C. § 2710(d)(7)(A)(i); *Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 76.) Through such an action, a tribe can obtain court intervention and mediation to help secure a compact. (25 U.S.C. § 2710(d)(7)(B)(i)–(vi).) If these efforts fail to yield an agreement, IGRA directs the federal Secretary of the Interior (hereinafter referred to as the Secretary) to impose "procedures" upon a state specifying how class III gaming by the tribe is to occur. (25 U.S.C. § 2710(d)(7)(b)(vii).)

### 2. *The concurrence requirement for gaming on certain after-acquired lands*

IGRA authorizes tribal gaming on "Indian lands," defined as "(A) all lands within the limits of any Indian reservation; and [¶] (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." (25 U.S.C. § 2703(4)(A)–(B); see also *id.*, § 5108 [authorizing the Secretary to acquire land in trust for a tribe]; 25 C.F.R. §§ 151.10, 151.11 (2020) [articulating criteria to be considered by the Secretary in determining whether to place land into

---

*supra*, 64 F.3d at p. 1258 with *Mashantucket Pequot Tribe v. State of Conn.* (2d Cir. 1990) 913 F.2d 1024, 1030.)

trust for a tribe].)[2]  But the statute generally *prohibits* class II and class III gaming on lands acquired by the federal government in trust for the benefit of an Indian tribe after October 17, 1988, the statute's date of enactment.  (25 U.S.C. § 2719(a).)  This proscription responds to concerns raised in Congress "about the possibility that tribal governments might acquire land in or near metropolitan areas on which they might open bingo or even casino facilities."  (Boylan, *Reflections on IGRA 20 Years After Enactment* (2010) 42 Ariz.St. L.J. 1, 9–10.)

The statute provides for several exceptions that moderate the general rule prohibiting class II and class III gaming on "after-acquired" trust lands.  Among them, the prohibition does

---

[2]      A federal regulation promulgated in 2008 (Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354 (May 20, 2008)) defines "reservation" as "(1) Land set aside by the United States by final ratified treaty, agreement, Executive Order, Proclamation, Secretarial Order or Federal statute for the tribe, notwithstanding the issuance of any patent; [¶] (2) Land of Indian colonies and rancherias (including rancherias restored by judicial action) set aside by the United States for the permanent settlement of the Indians as its homeland; [¶] (3) Land acquired by the United States to reorganize adult Indians pursuant to statute; or [¶] (4) Land acquired by a tribe through a grant from a sovereign, including pueblo lands, which is subject to a Federal restriction against alienation."  (25 C.F.R. § 292.2 (2020).)  Prior to the promulgation of this regulation, the meaning of "reservation," as used in the relevant provisions of IGRA, was less certain. (Compare *Sac and Fox Nation of Missouri v. Norton* (10th Cir. 2001) 240 F.3d 1250, 1267 with *Exposing Truth about Casinos v. Kempthorne* (D.C. Cir. 2007) 492 F.3d 460, 465.)

not apply to trust lands that are "located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988" (25 U.S.C. § 2719(a)(1)), or when "lands are taken into trust as part of — [¶] (i) a settlement of a land claim, [¶] (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or [¶] (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition" (*id.*, § 2719(b)(1)(B); see also 25 C.F.R. §§ 292.3–292.12 (2020)). These exceptions have been described as either "so obvious that they might be seen as merely technical corrections to the general definition of 'Indian lands'" or "relatively noncontroversial from a conceptual standpoint because they too have history behind them." (Jensen, *Indian Gaming on Newly Acquired Lands* (2008) 47 Washburn L.J. 675, 687 (hereinafter Jensen).) "[A]ll require, at least indirectly, demonstrating a strong link between the tribe and the land at issue . . . ." (*Id.*, at p. 688.) Furthermore, "because these provisions deal with circumstances that are exceptional, they are less likely to be of general public interest" than the exception that depends on the existence and exercise of the power to concur. (*Ibid.*)

This additional exception involving the power to concur appears at section 20(b)(1)(A) of IGRA, which provides that tribal gaming may occur on land taken into trust by the federal government for a tribe after IGRA's date of enactment if "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on [the] newly acquired lands would be in the best interest of

the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination." (25 U.S.C. § 2719(b)(1)(A).) A positive two-part determination by the Secretary does not absolutely require a showing that the property involved is close to a tribe's existing reservation lands, or that the tribe has a historical connection to the site, although these are among the facts considered by the Secretary in determining whether a gaming establishment would be in the best interest of the tribe and its members and whether it would or would not be detrimental to the surrounding community. (25 C.F.R. §§ 292.16, 292.17, 292.21(a) (2020); see also *id.*, § 151.11(b) (2020) [identifying the location of off-reservation land proposed to be taken into trust for a tribe, relative to a tribe's reservation, as a factor to be considered by the Secretary in deciding whether to take the land into trust].)

Section 20(b)(1)(A) of IGRA, with its requirements of a two-part determination by the Secretary and a concurrence by the appropriate governor, "is Section 20's only truly discretionary exception." (All, *John McCain and the Indian Gaming "Backlash": The Unfortunate Irony of S. 2078* (2006) 15 Kan. J.L. & Pub. Pol'y 295, 302 (hereinafter All).) Because the sequence described by section 20(b)(1)(A) "could apply to any tribe, it is by definition a broader exception than any of the mandatory exceptions" IGRA provides to the law's general prohibition of gaming on after-acquired lands. (All, at p. 303.) As one scholar has explained, this is the exception for "newly acquired lands most likely to have broad application — and

most likely therefore to generate public discussion and, for some, dismay." (Jensen, *supra*, 47 Washburn L.J. at p. 688.)

Although IGRA is the source of the concurrence procedure, whether an individual state governor has the power to concur is a matter of state law. (*Confederated Tribes*, *supra*, 110 F.3d at p. 697.) And in contrast with IGRA's provision of a cause of action when a state does not engage in good faith compact negotiations, nothing within the statute allows a tribe to seek judicial review of a Governor's refusal to issue a concurrence. Thus, the concurrence requirement "essentially provides veto power to the Governor of the State in which the land [proposed as a site for gaming operations] is located." (Sheppard, *Taking Indian Land into Trust* (1999) 44 S.D. L.Rev. 681, 687.)

## B. Proposition 5

The enactment of IGRA did not quell the debates in this state over tribal gaming. "Despite IGRA's negotiation and compact framework, several unresolved conflicts . . . developed between the State of California and Indian tribes surrounding class III gaming and, especially, gaming devices in casinos." (*Hotel Employees*, *supra*, 21 Cal.4th at p. 596.)

Proposition 5, an initiative measure appearing on the November 1998 ballot, was designed to better define the parameters for tribal gaming within the state. This measure included a model gaming compact that, if requested by a tribe, was to be promptly approved by the Governor as a ministerial matter. (Gov. Code, § 98002, subd. (a).) The model compact authorized class III card games and certain slot machines, so long as the payouts drew from a "players' pool" funded by

player wagers. (*Id.*, § 98004.) Another provision within Proposition 5 authorized the Governor to negotiate gaming compacts with terms different from those contained in the model compact and to reach agreement with tribes on such compacts. (Gov. Code, § 98002, subd. (b).) Nothing within Proposition 5 expressly conferred a power to concur upon the Governor.

Proposition 5 passed, but that victory was short-lived. We determined in *Hotel Employees* that the proposition's model compact authorized gaming that the state Constitution precluded as representative of "casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e).) On that basis, we concluded that the vast majority of the initiative, including its model compact, was invalid and unenforceable. (*Hotel Employees*, *supra*, 21 Cal.4th at p. 615.) We held that only the initiative's waiver of sovereign immunity for certain claims brought in federal court — part of section 98005 of the Government Code — was severable from the invalid portions of Proposition 5 and survived. (*Hotel Employees*, at pp. 614–615.)

## C. Proposition 1A

Within weeks of our decision in *Hotel Employees*, overwhelming majorities in both the Senate and the Assembly voted to place Proposition 1A before the electorate at the March 2000 primary election. Through Proposition 1A, voters were asked to decide whether to add a new subdivision (f) to article IV, section 19 of the state Constitution (article IV, section 19(f)), providing in part that notwithstanding constitutional constraints on gaming, "the Governor is authorized to negotiate and conclude compacts, subject to

ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 1A, p. 90 (Voter Information Guide).)

Coincident with Proposition 1A's placement on the ballot, then-Governor Gray Davis negotiated gaming compacts with 57 tribes. (*In re Indian Gaming Related Cases*, *supra*, 331 F.3d at pp. 1105–1106.) None of these compacts required a concurrence. The Legislature promptly ratified the compacts (Stats. 1999, ch. 874, § 1, pp. 6257–6260), which authorized forms of class III gaming (e.g., banked card games) that were not permitted under the model compact found within Proposition 5.

Because of the constitutional prohibition on gaming, however, these negotiated compacts would become effective only if Proposition 1A passed. Which it did: Proposition 1A was approved by voters at the March 2000 primary election.

### D. Factual and Procedural Background

The Enterprise Rancheria of Maidu Indians (the Enterprise Tribe) was federally recognized as a sovereign Indian tribe in 1915. In June 2002, the Enterprise Tribe asked the federal government to take approximately 40 acres of off-reservation land into trust for the tribe. This parcel is in Yuba County, near the community of Olivehurst. It is situated approximately 36 miles by car from where the Enterprise Tribe maintains its core governmental functions. The Enterprise Tribe subsequently confirmed that the purpose of the proposed

trust acquisition was to host a class III gaming facility. The tribe supported its application for a casino with documentation of the economic benefits that would accrue to the tribe and the surrounding community if the casino project went forward.

In September 2011, the Secretary issued a favorable two-part determination pursuant to section 20(b)(1)(A) of IGRA. The Secretary concluded that gaming on the parcel would be in the best interest of the Enterprise Tribe and would not be detrimental to the surrounding community or to neighboring tribes. The Secretary also found that the Enterprise Tribe had a "significant historical connection" to the site.

The Secretary requested that then-Governor Jerry Brown concur in this determination. The Governor issued his concurrence in August 2012. In 2013, the Secretary took the land into trust for the tribe for the purpose of gaming.

On behalf of the state, the Governor negotiated a compact for class III gaming with the Enterprise Tribe. The proposed compact was submitted to the Legislature for approval. The Legislature failed to ratify the agreement, however, and it died by its own terms in 2014. The Enterprise Tribe invoked IGRA's judicial failsafe, arguing that the Legislature's inaction amounted to a failure by the state to proceed in good faith. The federal district court rejected the state's assertion of sovereign immunity under the Eleventh Amendment as inconsistent with the waiver appearing at section 98005 of the Government Code. (*Estom Yumeka Maidu Tribe v. California* (E.D.Cal. 2016) 163 F.Supp.3d 769, 776–777.) The court concluded that the state had not met its burden of showing it had negotiated in good faith. (*Id.*, at p. 786.) It ordered the parties to conclude a compact within 60

days.    (*Id.*, at pp. 786–787; see also 25 U.S.C.
§ 2710(d)(7)(B)(iii).)

Neither this order nor subsequent mediation led to a
compact.  In August 2016, the Secretary issued secretarial
procedures for the conduct of class III gaming on the parcel.
The Enterprise Tribe's casino property — the Hard Rock Hotel
& Casino Sacramento at Fire Mountain — has since opened at
the Olivehurst site.

Plaintiff United Auburn Indian Community of the
Auburn Rancheria operates the Thunder Valley Casino Resort
in Lincoln, California.  This casino is located within 25 miles of
the Hard Rock Hotel & Casino Sacramento at Fire Mountain.
United Auburn asserts that the new casino will siphon
business away from its facility, with negative economic
consequences for the tribe.  In this lawsuit, United Auburn
contends that as a matter of state law, the Governor lacks the
power to concur in the Secretary's two-part determination.
The superior court rejected United Auburn's argument, as did
the Court of Appeal.  (*United Auburn Indian Community of
Auburn Rancheria v. Brown* (2016) 4 Cal.App.5th 36, 42.)

### E.  Other Litigation

While this case was pending before us, we granted review
in another matter that also presents the question whether the
Governor has the power to concur.  In *Stand Up for California!
v. State of California* (2016) 6 Cal.App.5th 686 (*Stand Up!*), the
Fifth District Court of Appeal concluded that the Governor
lacked such authority, at least given the specific facts as
alleged in that case.

In *Stand Up!*, the Governor issued a concurrence in connection with an off-reservation casino proposed by the North Fork Rancheria of Mono Indians and negotiated a compact for gaming operations by the tribe. The off-reservation land where the casino would be situated was then taken into trust by the federal government. Unlike here, the Legislature ratified the compact that the Governor had negotiated. But the compact was made subject to a voter referendum (Proposition 48) at the November 2014 election, at which time it was rejected by the voters. (See *Stand Up!*, *supra*, 6 Cal.App.5th at pp. 691–694 [recounting these events].)

All three justices on the *Stand Up!* panel concluded that under the circumstances, the Governor lacked the authority to concur with the Secretary's two-part determination. Justice Smith, emphasizing that voters had rejected the gaming compact the Governor had negotiated, determined that "it would be perverse to find the Governor has an implied authority based on an express power [to compact] that the state has finally decided not to exercise, after protracted consideration by the Governor, the Legislature, and the voters." (*Stand Up!*, *supra*, 6 Cal.App.5th at p. 700.)

Concurring and dissenting in *Stand Up!,* Justice Detjen focused on the fact that a concurrence had been issued and a compact had been negotiated before the federal government acquired the land in trust for the tribe. She explained, "Because the land was not held in trust at the time the Governor negotiated the announced compact, the Governor was not negotiating a compact for gaming on Indian lands and, thus, exceeded any authority granted by Proposition 1A." (*Stand Up!*, *supra*, 6 Cal.App.5th at p. 715 (conc. & dis. opn. of

Detjen, J.).) Because the concurrence related to what Justice Detjen regarded as an improper exercise of the compacting power, it too was invalid. (*Id.*, at pp. 710, 718–719 (conc. & dis. opn. of Detjen, J.).)

Also concurring and dissenting, Justice Franson took the position that regardless of whether a gaming compact has or has not been approved, the state Constitution, as amended by Proposition 1A, does not grant the Governor the power to concur. Regarding Proposition 1A, he explained, "[E]xpanding Indian gaming to off-reservation locations was and is a controversial issue of public policy with a wide range of consequences for Californians. It is implausible that the average voter would have understood the controversy was being resolved by an undisclosed, implied grant of the authority to concur." (*Stand Up!, supra,* 6 Cal.App.5th at p. 723 (conc. & dis. opn. of Franson, J.).)[3]

## II. DISCUSSION

" 'In construing constitutional and statutory provisions, whether enacted by the Legislature or by initiative, *the intent of the enacting body is the paramount consideration.*' " (*Legislature v. Eu* (1991) 54 Cal.3d 492, 505.) We construe the language of a measure approved by the electorate as it would

---

[3] Justice Franson's concurring and dissenting opinion in *Stand Up!* used "the phrase 'off-reservation casinos' to mean casinos located on 'after-acquired trust land' for which the Secretary of the Interior's . . . two-part determination and the Governor's concurrence is required before casino-type gambling may proceed at that location." (*Stand Up!, supra,* 6 Cal.App.5th at p. 722, fn. 1 (conc. & dis. opn. of Franson, J.).)

be understood by an average voter. (*People v. Adelmann* (2018) 4 Cal.5th 1071, 1080 [" '[t]he particularized meaning of words in complex, legislatively enacted statutes has little bearing on the interpretation of words in an initiative, which we construe according to their ordinary meanings as understood by 'the average voter' "]; see also *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 902; *Wallace v. Zinman* (1927) 200 Cal. 585, 592.) This general rule whereby we construe words as carrying their normal, everyday meanings is subject to an exception when it appears that voters would have understood a term as having a special or technical meaning in its specific context. (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1318; *Kaiser v. Hopkins* (1936) 6 Cal.2d 537, 538.) We also presume that the average voter is aware of existing law, but this presumption is "not conclusive." (*Santos v. Brown* (2015) 238 Cal.App.4th 398, 410.)

## A. Article IV, Section 19(f) Does Not Confer a Power To Concur

As added by Proposition 1A, article IV, section 19(f) carves out a limited exception to the general prohibitions on lotteries and casino gaming that appear elsewhere in the same section of the state Constitution. Article IV, section 19(f) provides, in full, "Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card

games are hereby permitted to be conducted and operated on tribal lands subject to those compacts."

As Justice Franson determined in his concurring and dissenting opinion in *Stand Up!*, an average voter would not have understood this language as giving the Governor the power to concur. Article IV, section 19(f) speaks only of compacts to be ratified by the Legislature, not gubernatorial concurrences. This cannot be regarded as an inadvertent oversight. By giving or withholding a concurrence, a governor exercises veto power over the application of section 20(b)(1)(A) of IGRA, the broadest and perhaps most controversial of the exceptions to the general prohibition against gaming on after-acquired tribal lands. (All, *supra*, 15 Kan. J.L. & Pub. Pol'y at p. 304; Jensen, *supra*, 47 Washburn L.J. at p. 688.) Given how federal courts have construed Government Code section 98005, recognizing a power to concur means that a determination by a single state official, the Governor, imposes upon the state an obligation to negotiate in good faith for class III gaming on property associated with a positive two-part determination by the Secretary. In fact, the Governor's concurrence is the *only* authorization by the state that is absolutely necessary for a casino offering this kind of gaming to open at such a site. The facts of this case demonstrate as much — the Hard Rock Hotel & Casino Sacramento at Fire Mountain has become operational without the Legislature ever having ratified a compact, with secretarial procedures for the conduct of gaming having been imposed upon the state instead. Nothing within article IV, section 19(f) reasonably conveys that it gives the Governor such a consequential power. (Cf. *In re Christian S.* (1994) 7 Cal.4th 768, 782 ["We are not persuaded the

Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter and created a significant departure from the existing law"].)

Nor is the existence of a power to concur somehow implied by Proposition 1A's authorization of gaming compacts. The Governor's involvement with a compact is "of a qualitatively different nature from his concurrence in the Interior Secretary's discretionary 'best-interests' waiver of § 2719's general gaming prohibition." (*Keweenaw Bay Indian Community v. U.S.* (6th Cir. 1998) 136 F.3d 469, 477.) Under IGRA, compacts and concurrences are distinct acts with different consequences. (See *Keweenaw Bay*, at p. 475 ["the existence of a valid, approved compact does not eliminate other statutory requirements, in this case, conformity with § 2719"].) Class II gaming can occur on off-reservation lands pursuant to a concurrence, without the need for a gaming compact. And compacts can be completed and ratified even if the Governor lacks the power to concur, provided that they authorize only class III gaming operations on trust lands acquired on or before October 17, 1988, or on after-acquired trust lands for which no concurrence is required. These are in fact the most common kinds of gaming compacts; as previously mentioned, not one of the compacts directly before the voters at the March 2000 primary election required a concurrence to become effective.

In short, a voter in the March 2000 primary election would not have understood Proposition 1A's authorization of gaming compacts as subsuming an implied power to concur. By authorizing compacts but not concurrences, Proposition 1A struck a balance. The measure permitted a relatively broad

array of class III tribal gaming (at least compared to what was previously allowed) on reservation lands and after-acquired trust lands for which no concurrence is required, but it did not open the door to the most open-ended and potentially controversial category of class III casino developments, those requiring the exercise of the concurrence power.

## B. The Ballot Materials for Proposition 1A Do Not Support a Power To Concur

The ballot materials associated with Proposition 1A provide additional indications that the voters who approved that measure did not intend to confer the power to concur. Where, as here, a constitutional amendment has been approved by the voters, "the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245–246.) Nothing within the voter pamphlet for the March 2000 primary election explained to voters that Proposition 1A would give the Governor the power to concur. To the contrary, through such silence and the affirmative representations of the measure's proponents, these materials suggested that Proposition 1A would *not* pave the way for class III casinos on after-acquired trust lands through section 20(b)(1)(A) of IGRA.

Beginning with the Legislative Analyst's analysis of the measure, this description never raised the possibility that Proposition 1A could lead to off-reservation gaming that requires a concurrence. The analysis addressed Proposition 5, our *Hotel Employees* decision, and the gaming compacts with

57 tribes that would become effective if Proposition 1A passed and the federal government gave its approval. (Voter Information Guide, *supra*, analysis of Prop. 1A by Legis. Analyst, pp. 4–5.) The analysis also explained that Proposition 1A "amends the State Constitution to permit Indian tribes to conduct and operate slot machines, lottery games, and banked and percentage card games on Indian land. These gambling activities could only occur if (1) the Governor and an Indian tribe reach agreement on a compact, (2) the Legislature approves the compact, and (3) the federal government approves the compact." (Voter Information Guide, analysis of Prop. 1A by Legis. Analyst, p. 5.) By failing to include a concurrence among the prerequisites for class III gaming, this analysis conveyed that the measure authorized only gaming operations for which no concurrence is required.

The arguments by proponents of Proposition 1A that appeared within the spring 2000 ballot pamphlet carried a similar message. The argument in favor of Proposition 1A advised that voter approval was necessary to preserve tribal gaming where it was currently being conducted: "We are asking you to vote YES on Proposition 1A so we can keep the gaming we have on our reservations." (Voter Information Guide, *supra*, argument in favor of Prop. 1A, p. 6.) This argument also explained, "Prop 1A has been put on the March ballot to . . . establish clearly that Indian gaming on tribal lands is legal in California." (*Ibid*.) In response to opponents' arguments that "[c]asinos won't be limited to remote locations" (Voter Information Guide, argument against Prop. 1A, p. 7) and "Indian tribes are already buying up prime property for casinos in our towns and cities" (*ibid*.), proponents quoted a

21

former field investigator for the National Indian Gaming Commission as saying, " 'Proposition 1A and federal law strictly limit Indian gaming to tribal land. The claim that casinos could be built anywhere is totally false' " (Voter Information Guide, rebuttal to argument against Prop. 1A, p. 7), and repeated an economist's assertion that " '[t]he majority of Indian Tribes are located on remote reservations and the fact is their markets will only support a limited number of machines' " (*ibid*.).

At oral argument, counsel for the Governor characterized at least the first of these responses as "clever" and technically correct. But when reviewing a ballot argument for insight into voter intent, the question is not whether a party to the debate earns points for artful wordplay. What matters instead is how an argument contributed, if at all, to a voter's understanding of the measure to which it pertains. Here, an average voter would have understood these responses as addressing the opponents' assertion that if Proposition 1A passed, casinos could crop up in towns and cities across the state. The responses imparted to an average voter that this claim was false, and that the casinos authorized by Proposition 1A would be situated on " 'remote reservations' " (Voter Information Guide, *supra*, rebuttal to argument against Prop. 1A, p. 7), or at least where tribes were " 'located' " (*ibid*.). By implication, these responses corroborated what an average voter already would have gleaned from the proposition's text: that the measure did not confer the power to concur. For as has been explained, if the Governor does have this power, it can open the door to gaming facilities situated on any land within the state that the federal government has found suitable for

22

gaming and agrees to take into trust for a tribe — decisions that do not strictly demand that the property be close to an existing reservation or that the tribe have a historical relationship to the proposed trust land.[4]

---

[4] Similarly, on www.yeson1A.net, a website that Proposition 1A's proponents directed voters toward in the ballot materials (Voter Information Guide, *supra*, rebuttal to argument against Prop. 1A, p. 7), the most pertinent explanation of the measure's effect on where tribal gaming could take place equated "Indian lands" and "tribal lands" with "reservation lands," and indicated that tribal casinos would be limited to these lands. The website included the following exchange: "Q. How would the number of casinos be limited under the compact and would the passage of Prop 1A allow Indian tribes to build casinos outside of tribal lands? [¶] A. There are several clear limitations: First, existing federal law strictly limits tribal gaming to Indian lands only. *The Indian Gaming Regulatory Act (IGRA) passed by Congress in 1988, mandates that Indian casinos can only be located on tribal reservation lands.* [¶] Second, under the recent tribal-state compact signed by the Governor, a California tribe is specifically prohibited from operating more than two casinos on their reservation. [¶] Third, the economic reality will continue to limit the number of Indian casinos in our state. In most areas where Indian gaming is economically viable, the local tribes already have a casino. Most non-gaming tribes are located too far from population centers, in remote areas where an Indian casino simply would not be practical. In Nevada, casinos are legal everywhere but you can drive for miles through that state without seeing a casino in non-urban areas because the market to support them does not exist." (Yes on 1A, *Proposition 1A: Answers to Common Questions* (Mar. 6, 2000) <http://digital.library.ucla.edu/websites/2000_999_028/> [as of Aug. 28, 2020], italics added; this citation is archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.) Regardless of whether

All in all, I agree with Justice Franson's conclusion in *Stand Up!* that Proposition 1A cannot properly be construed as giving the Governor the power to concur. As he recapped, after an exhaustive analysis of the issue, "First, the text of Proposition 1A plainly omits the power to concur in the Secretary's two-part determination. Second, an implied grant of that power is not necessary under the principles of California law that govern necessary implications. Third, the wording of Proposition 1A and the materials in the ballot pamphlet did not inform the average voter that approving Proposition 1A would grant the Governor the power to concur or, more generally, would grant the Governor the authority to either veto or approve a proposed off-reservation casino. Fourth, expanding Indian gaming to off-reservation locations was and is a controversial question of public policy with a wide range of consequences, and it is implausible that the average voter would have understood that Proposition 1A granted the Governor an implied authority to concur and thereby allowed off-reservation casinos. The controversy should not be resolved by implication when the voters were not informed that such an

Proposition 1A actually limited casinos to reservation lands, as opposed to reservation lands and a limited array of off-reservation lands where no concurrence would be required for the institution of casino operations, this description of where casinos could appear if Proposition 1A passed is more consistent with an interpretation of the measure as not encompassing a power to concur than it is with the majority's construction of the constitutional amendment as authorizing the more open-ended siting of casinos in the state.

implication existed." (*Stand Up!*, *supra*, 6 Cal.App.5th at p. 767 (conc. & dis. opn. of Franson, J.).)

### C. The Arguments for Recognizing a Power To Concur Are Unpersuasive

The most weighty argument in favor of the majority's interpretation of Proposition 1A derives from the use of the term "Indian lands" within article IV, section 19(f)'s authorization of compacts for gaming "by federally recognized Indian tribes on Indian lands in California in accordance with federal law." As previously observed, IGRA provides a framework for tribal gaming on "Indian lands," which the statute defines as "(A) all lands within the limits of any Indian reservation; and [¶] (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." (25 U.S.C. § 2703(4)(A)–(B).) This definition leads to an argument in favor of recognizing a power to concur that proceeds as follows: Proposition 1A authorizes compacts for gaming on "Indian lands"; IGRA supplies a broad definition of "Indian lands"; an average voter would have understood Proposition 1A as authorizing compacts for casinos located on *any* such lands; therefore, article IV, section 19(f) incorporates an implied power to concur, because a concurrence is necessary for class III gaming operations on certain after-acquired Indian lands.

I find this argument unpersuasive. First, it is unclear at best that an average voter would have understood "Indian lands," as that term is used in article IV, section 19(f), as carrying the technical meaning assigned to it by section 4 of

IGRA. Article IV, section 19(f) uses "Indian lands" interchangeably with another term, "tribal lands," that appears nowhere in the federal statute. A voter could have regarded this use of different phrasing as communicating that Proposition 1A did not embrace the definition IGRA attaches to one, and only one, of these terms. Second, even assuming that voters did understand "Indian lands" within Proposition 1A as invoking IGRA's definition of this term, article IV, section 19(f) does not say that gaming may occur on *any* or *all* of these lands. Instead, this provision allows the Governor to "negotiate and conclude compacts, subject to ratification by the Legislature" through which certain specified forms of gaming may occur on Indian lands, and repeats that this gaming may occur "on tribal lands subject to those compacts." Without any reference to a power to concur, an average voter would have understood article IV, section 19(f) as envisioning class III gaming only on those "Indian lands" or "tribal lands" on which a compact, and a compact alone, provides sufficient state authorization for the institution of gaming operations.

The majority also claims that the Governor possesses the "inherent power to concur to allow class III gaming." (Maj. opn., *ante*, at p. 20.) But this bold assertion is exactly that — mere assertion. The majority nowhere explains why the Governor possesses such inherent authority in a sphere controlled by the state Constitution's flat prohibition of Nevada and New Jersey-style casinos and its specification of a limited exception for tribal gaming. These provisions of article IV, section 19 establish that the Governor has no such inherent power. That which is not authorized by article IV, section 19(f) remains forbidden by article IV, section 19(e). And as I have

explained, neither the text nor the context of article IV, section 19(f) supports an interpretation of this provision as authorizing the Governor to concur.  In light of article IV, section 19(e)'s broad prohibition of Nevada and New Jersey-style casinos, this conclusion resolves the question before us.  The electorate that approved Proposition 1A was not required to go further and explicitly *deny* the Governor the power to concur in order to prevent its exercise.  (See maj. opn., *ante*, at pp. 19–20, 35–37.)

To draw from Justice Franson's concurring and dissenting opinion in *Stand Up!* one final time, "The initiative process functions best when voters are (1) informed that the initiative addresses a controversial issue with a wide range of impacts for Californians and (2) told how the initiative resolves that controversial issue.  When voters are so informed, courts can 'give effect to the voters' formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote.'  (*Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 930 . . . .)" (*Stand Up!*, *supra*, 6 Cal.App.5th at pp. 722–723 (conc. & dis. opn. of Franson, J.).)  Today's decision does not advance the goal of transparency.  Proposition 1A's text and ballot materials emphasized legislative approval for gaming compacts, they did not disclose the existence of the power to concur, and they did not portray the proposition as opening the door to off-reservation gaming to the extent that concurrences can.  Under the circumstances, it is a mistake to conclude that the voters who approved the measure intended to give the Governor the power to concur.

27

### III.  CONCLUSION

Legislative constitutional amendments, like initiatives, provide concrete examples of direct democracy in action. Courts must review the electorate's handiwork carefully.  If we give voters more or less than what they approved, our interpretations can sow cynicism and distrust of the process.

To accurately capture the intent behind a measure approved by the electorate, we must appreciate how average voters genuinely would have understood what was put before them.  Realistically, the average voter at the March 2000 election would not have understood article IV, section 19(f) as going beyond its plain language regarding compacts and also giving the Governor the power to concur.  Such a voter would not have locked into article IV, section 19(f)'s reference to "Indian lands," consulted IGRA, and concluded that even though the constitutional amendment did not mention a power to concur, it necessarily contemplated casinos that could exist only through the exercise of such a power.  And such a voter would not have understood Proposition 1A, with its focus on legislatively ratified compacts, as nevertheless allowing a casino to be built on off-reservation land such as that involved here even *without* a compact, so long as the Governor concurred and other prerequisites were met.

Voters clearly have the power to authorize tribal gaming on off-reservation trust lands to a greater extent than they did with Proposition 1A.  But by all indications, they chose a path that steps out of the shadow of the general state policy against Nevada and New Jersey-style casinos only so far as to allow class III gaming on those lands where no gubernatorial concurrence is required.  Where the majority sees twilight, I

see a series of decisions by the electorate — first prohibiting certain kinds of casino operations, then relaxing this restriction to a limited degree — to which we must defer. Because I believe that today's decision gives voters something different from what they bargained for, I respectfully dissent.

**CANTIL-SAKAUYE, C. J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** United Auburn Indian Community of the Auburn Rancheria v. Newsom
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 4 Cal.App.5th 36
**Rehearing Granted**

_____

**Opinion No.** S238544
**Date Filed:** August 31, 2020
_____

**Court:** Superior
**County:** Sacramento
**Judge:** Eugene L. Balonon

_____

**Counsel:**

Bingham McCutchen, Morgan, Lewis & Bockius, Thomas F. Gede and Colin C. West for Plaintiff and Appellant.

Snell & Wilmer, Sean M. Sherlock, Todd Lundell and Jenny Hua for Stand Up For California! as Amicus Curiae on behalf of Plaintiff and Appellant.

Fredericks Peebles & Morgan and Michael A. Robinson for Picayune Rancheria of Chukchansi Indians as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Frank Lawrence, Frank R. Lawrence, Zehava Zevit; Forman & Associates, George Forman, Jay B. Shapiro and Margaret Rosenfeld for the Mooretown Rancheria of Maidu Indians of California and Cachil Dehe Band of Wintun Indians of the Colusa Indian Community as Amici Curiae on behalf of Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael J. Mongan, State Solicitor General, Sara J. Drake, Assistant Attorney General, William P. Torngren and Timothy M. Muscat, Deputy Attorneys General, Max Carter-Oberstone, Deputy State Solicitor General, and Janill L. Richards, Principal State Deputy Solicitor General, for Defendant and Respondent.

Dentons US, Charles A. Bird, Matthew G. Adams; Maier Pfeffer Kim Geary & Cohen, Michael S. Pfeffer and John A. Maier for the Estom Yumeka Maidu Tribe of the Enterprise Rancheria, California as Amicus Curiae on behalf of Defendant and Respondent.

Maier Pfeffer Kim Geary & Cohen, John A. Maier; Wilmer Cutler Pickering Hale and Dorr, Danielle Spinelli, Christopher E. Babbitt, Jonathan A. Bressler and Claire Chung for North Fork Rancheria of Mono Indians as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas Gede
Morgan, Lewis, & Bockius LLP
One Market Street, Spear Tower
San Francisco, CA 94105
(415) 442-1000

Michael J. Mongan
State Solicitor General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
(415) 510-3920